**STATE of Tennessee**

v.

**Larry Paul KOFFMAN.**

Court of Criminal Appeals of Tennessee,
at Nashville.

Oct. 25, 2005 Session.

Feb. 23, 2006.

Application for Permission to Appeal
Denied by Supreme Court
Aug. 28, 2006.

Patrick G. Frogge, Nashville, Tennessee (on appeal); and Joe R. Johnson, II, Springfield, Tennessee (at trial), for the appellant, Larry Paul Koffman.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Dent Morriss, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

Following a jury trial, Defendant, Larry Paul Koffman, was convicted of aggravated robbery, a Class B felony, and aggravated assault, a Class C felony. The trial court sentenced Defendant as a Range II, multiple offender, to fifteen years for his aggravated robbery conviction and eight years for his aggravated assault conviction, and ordered Defendant to serve his sentences consecutively. On appeal, Defendant argues (1) that the trial court erred in not granting his motion to suppress his statement to the police; (2) that the evidence is insufficient to support his convictions; and (3) that the trial court erred in imposing consecutive sentences. After a thorough review of the record, we find that the trial court erred in admitting Defendant's statement into evidence, but conclude, based upon the facts presented in this case, that such error was harmless beyond a reason-

able doubt. We therefore affirm the judgments of the trial court.

## I. Background

Wendy Peden, an employee of the Keystop store in White House, testified that Defendant entered the store on September 22, 2002, shortly after 2:00 p.m. Ms. Peden stated that Defendant approached the cash register with a quart of Havoline oil. Ms. Peden rang up the sale, and Defendant handed her a five-dollar bill. When Ms. Peden opened the cash register to make change, Defendant began grabbing money out of the cash drawer. Ms. Peden saw a gun in Defendant's right hand. Defendant started to leave, then turned and pointed his gun at Ms. Peden. Defendant warned Ms. Peden not to come outside and left the premises in a red car.

Ms. Peden said that she tried to avoid making eye contact with Defendant during the robbery because she was terrified. Ms. Peden could not positively identify Defendant as the robber, but she said that the robber was "dirty" as if he had been working on a car.

Tracy Harney was visiting Ms. Peden in the store. Ms. Peden left their conversation when Defendant approached the sales counter. Ms. Harney said that she heard the cash drawer rattle when Defendant picked it up. She started to walk toward the cash register and saw Defendant take the money from the cash drawer and point a gun at Ms. Peden. Ms. Harney said that she walked away from the sales counter at that point so that Defendant would not see her. Ms. Harney could not describe Defendant's facial features, but she said that his clothes were dirty, and he wore a pair of blue jeans, a tee-shirt and a baseball cap. Ms. Harney said that Defendant appeared nervous.

Ms. Harney said that Defendant was in the store about five minutes. Another customer, later identified as Gary Frakes, entered the store during the robbery. Mr. Frakes brought his drinks to the counter, and Ms. Peden told him she had just been robbed. Ms. Harney said Mr. Frakes left the store to get the license plate number of Defendant's car.

Mr. Frakes testified that he was a regular customer at the Keystop, and he stopped at the store on the afternoon of the robbery to buy his children something to drink. The children, aged seventeen, thirteen, and ten, remained in the car while Mr. Frakes went inside. Mr. Frakes said that when he brought his purchases to the sales counter, Ms. Peden told him she had been robbed. Mr. Frakes left the store to record the license plate number of Defendant's car.

Mr. Frakes said that Defendant drove away in a red car, and he decided to follow Defendant's car in his vehicle. Defendant tuned left onto Highway 76 and then onto the ramp leading to Interstate 65. Mr. Frakes said that when the vehicles reached the top of the ramp, Defendant fired five or six shots at Mr. Frakes' car. Mr. Frakes said the vehicles were traveling about forty-five miles per hour at this point.

The two vehicles entered the interstate, and Mr. Frakes stayed three or four car lengths behind Defendant. Mr. Frakes retrieved his .45 Taurus automatic pistol from the driver's side floorboard, and asked his daughter to hand him the gun's magazine which was in the glove compartment. He also told his daughter to call 911. After he loaded his weapon, Mr. Frakes said that he fired two shots at Defendant's vehicle. Defendant ducked down and swerved toward the median. Mr. Frakes said that he tried to keep the other traffic on the interstate from passing

his vehicle by waving his hand out of his car window.

After Mr. Frakes fired his second shot, Defendant pulled his vehicle over to the right side of the interstate and stopped. Mr. Frakes pulled in behind Defendant and also stopped. Mr. Frakes said that Defendant exited his vehicle and began running towards him. Defendant discharged his gun twice at Mr. Frakes' vehicle, then tripped and dropped his gun. The magazine clip fell out of the gun, and Defendant ran into the woods.

Mr. Frakes said that he reported the incident to the 911 operator. Mr. Frakes explained that he returned Defendant's fire because he was afraid that he or his children might be injured. Mr. Frakes said that he never lost sight of Defendant between the time Defendant left the Keystop and when he ran into the woods. Mr. Frakes identified Defendant in court as the perpetrator of the offenses.

On cross-examination, Mr. Frakes said that he did not recollect telling the investigating officers that he was the first driver to slow down and pull off the interstate, and that Defendant pulled over after Mr. Frakes. Mr. Frakes also did not remember describing Defendant's hair as blonde, but he did recollect that he said Defendant was approximately six feet, two inches tall. Mr. Frakes said that when he entered the Keystop, he saw the back of Defendant's head as Defendant stood at the sales counter.

Officer Evan Bates, with the White House Police Department, testified that he received a report around 8:00 p.m. on September 22, 2002, that a suspicious male was walking down Union Road in the area where the Keystop robbery had occurred. Officer Bates spotted Defendant in the parking lot of an Amoco Station. He exited his patrol car and asked Defendant if he could talk to him. Defendant responded, "no," and began to flee. Officer Jonathan Dillard got out of the passenger side of the patrol car and chased Defendant. Defendant threw down a shirt and a gun, and then stopped running in response to the officers' verbal commands. Defendant told Officer Bates, "[I]t's me, I know I screwed up, I'm Larry Koffman, you got me." Officer Bates said that Defendant told him that Defendant would have shot himself if he had not lost the magazine to his gun. Officer Bates said that Defendant's clothes were wet, either from sweat or moisture from the woods.

On redirect examination, Officer Bates said that the report described the suspect as approximately six feet tall, with a burr haircut or a shaved head. Officer Bates said that Defendant was apprehended approximately two and one-half miles from his vehicle, and that there were woods along that stretch of the interstate.

Sergeant Matthew Marshall examined Defendant's vehicle. He found a magazine clip from a .9 mm gun on the ground and a quart of Havoline oil inside the car. Sergeant Marshall said that the investigating officers could not obtain any identifiable fingerprints from the crime scene.

Sergeant Marshall then joined Officer Bates at the parking lot where Defendant had been apprehended. He described Defendant as nervous and agitated, but stated that Defendant was coherent and appeared to be aware of what was happening. When Sergeant Marshall, Officer Bates and Defendant arrived at the police station, Defendant told Sergeant Marshall that he was scared he would be mistreated, and Sergeant Marshall tried to reassure Defendant.

Sergeant Marshall read Defendant's *Miranda* rights to him and began to tape his statement. Defendant accurately described Ms. Peden and Ms. Harney. He

said he entered the Keystop store and got a quart of motor oil from the shelf. Defendant said that he handed a five-dollar bill to Ms. Peden. Defendant said that when Ms. Peden opened the cash register, he told her to give him the money. Defendant said he "just raised his shirt and kind of took [the gun] out," but he said that he did not believe that he pointed the gun at Ms. Peden. Defendant identified the red car found on the interstate as his and executed a written consent form for the vehicle to be searched.

Defendant said in his statement that after he drove away from store, he saw in his rearview mirror that another car was following him. Defendant said that he assumed that this person was an off-duty police officer, because the man stuck his head out of his car window and fired at Defendant's vehicle. Defendant said he fired his weapon about three times in response, but he did not hit the man's vehicle. Defendant stated that his car "just blew up," and he jumped out while the car was still moving. The magazine clip fell out of his gun, and he ran into the woods.

On cross-examination, Sergeant Marshall said that Defendant began talking as soon as Sergeant Marshall read his *Miranda* rights to him. Sergeant Marshall said that he did not want to interrupt him, so Defendant's signature on the written waiver form was not obtained until the middle of the interrogation. Sergeant Marshall said that he did not ask Defendant if he could read or write, or whether he was on medication. He stated that based on his experience, Defendant did not appear to be under the influence of drugs or alcohol and seemed coherent. Sergeant Marshall agreed that Defendant told him during the interview that he used morphine.

Sergeant Marshall said that Defendant asked to speak to Judge Wiseman and Mariah Wooten at the beginning of the interview, but Sergeant Marshall said "it was not clear what [Defendant] was asking." Defendant was not allowed to make a telephone call. Sergeant Marshall said that Defendant cried at various times during the interview, but his conversation was coherent, and he was not slurring his words.

## II. Motion to Suppress

Relying on *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and its progeny, Defendant contends that he made an unequivocal request for an attorney at the beginning of his custodial interrogation. Defendant argues that the continued questioning by the investigating officers without complying with his request violated his Fifth Amendment right to counsel.

After reviewing the audio tape of Defendant's statement, we agree with the trial court's finding that the transcript of Defendant's taped statement which was prepared by the White House Police Department does not accurately reflect the initial exchange between Defendant and Sergeant Marshall. The prosecutor introduced the transcript during Sergeant Marshall's direct examination, but acknowledged that he had not compared the transcript to the tape recording. Based on its review of the tape which was played during Sergeant Marshall's cross-examination, the trial court requested the official court reporter to prepare a transcript of Defendant's statement. The excerpts from Defendant's statement which are reflected below, therefore, are based on our review of the audio tape as well as the court reporter's transcript.

At the suppression hearing, Sergeant Marshall testified that at the time of the offense, he was a detective with the White House Police Department, and he conduct-

ed Defendant's interview after Defendant was apprehended on September 22, 2002. Sergeant Marshall accompanied Officer Bates and Defendant in the patrol car to the police station. Sergeant Marshall described Defendant as agitated, but coherent, during the short ride.

Sergeant Marshall testified that Defendant never made "an affirmative request for an attorney" during the interview. He acknowledged that Defendant mentioned Judge Wiseman at various times, but Sergeant Marshall said that he did not know Judge Wiseman.

Sergeant Marshall said that he read Defendant his *Miranda* rights, including the right to have counsel present, and Defendant verbally said that he understood his rights. Sergeant Marshall said that Defendant immediately began talking, and Defendant's written waiver of his *Miranda* rights was not obtained until midway through the interview process because Sergeant Marshall did not want to interrupt Defendant.

According to our review of the tape, the following exchange occurred as Defendant was being led into the interview room:

SERGEANT MARSHALL: That's why we have locks on the doors and everything else.

DEFENDANT: I want to call Judge Wiseman and Ms. Wooten.

SERGEANT MARSHALL: Who's— who's Ms. Wooten?

DEFENDANT: She used to be the federal deputy public defender. You know I was a bank robber once. My life's over.

CHIEF OF POLICE HIGALDIACK: You got your Nextel?

SERGEANT MARSHALL: Yes.

CHIEF OF POLICE HIGALDIACK: (Inaudible).

The remainder of Defendant's interview as reflected in the transcript prepared by the court reporter and admitted into evidence at trial reflects the following dialogue.

DEFENDANT: Can I really have a glass of water?

SERGEANT MARSHALL: We're getting—you want a Coke; right?

DEFENDANT: Before whatever—if I'm—am I going to Metro?

SERGEANT MARSHALL: Well, we'll—we'll talk about that, but—

DEFENDANT: Well, whatever—

SERGEANT MARSHALL:—the first thing I want—

DEFENDANT: (Inaudible).

SERGEANT MARSHALL: No, I want you to calm down, [Defendant]. Nobody here is going to hurt you.

DEFENDANT: I don't care.

SERGEANT MARSHALL: Yeah, but—

DEFENDANT: It doesn't matter, all right?

SERGEANT MARSHALL: I know.

DEFENDANT: It doesn't matter.

SERGEANT MARSHALL: I know. I (inaudible).

DEFENDANT: I did what I did. Okay. I'm not crying or anything, you know, I got to be a man about that. But why . . . didn't you all shoot me? Jesus Christ, you know, you know— anyways.

SERGEANT MARSHALL: Because we—because we don't want to shoot anybody, [Defendant].

DEFENDANT: Oh.

SERGEANT MARSHALL: We really don't, okay? We want to protect people, okay?

DEFENDANT: Yeah. I dropped my clip when I jumped out of the car. Did he find it? You know, my clip?

SERGEANT MARSHALL: I think they found it.

DEFENDANT: Yeah. And then just now I start running, can I talk to you, sir? No, you can't. You know, so, I start running, it falls out of my back pocket. I wanted to draw it, because then he would have shot me, you know. And nothing ever goes right. But (inaudible)—

UNIDENTIFIED VOICE: Here's your Coke.

DEFENDANT: But I really do thank you for it. No. I have been on Morphine.

SERGEANT MARSHALL: Okay.

UNIDENTIFIED VOICE: There's your Coke.

DEFENDANT: For a long time. Long time.

. . .

SERGEANT MARSHALL: All right. [Defendant], listen. I know that there's some things that have happened today that are kind of, you know, kind of strange and maybe not normal for people, okay? Um, but before we can talk about them I do have to let you know what your rights are, okay? Do you understand that?

DEFENDANT: Yeah, I know what my rights are.

SERGEANT MARSHALL: Okay. Well, I just want to explain them just in case you have any questions.

DEFENDANT: Yeah.

Sergeant Marshall then read Defendant his *Miranda* rights at this point in the interrogation, and Defendant verbally said that he understood his rights. Sergeant Marshall acknowledged that he was aware that a federal public defender was a law-yer. Sergeant Marshall said that he did not fill out all of the waiver form because he was not required to ask questions about Defendant's reading and writing skills, or whether he was under the influence or taking any medications. Sergeant Marshall recollected that Defendant told him that he used morphine.

 The trial court found that Defendant's request to call Judge Wiseman and Ms. Wooten was equivocal when viewed in light of the totality of the circumstances following Defendant's requests, including the various statements Defendant made during the course of the interview. The trial court stated:

From listening to the tape, it is apparent that [Defendant] was upset, but he also knew his right to have an attorney present and had a clear understanding of what he was saying to the officer was incriminating. The [subsequent] statement that he knew the attorneys would be mad is an indication that he did not request counsel at the beginning. The immediate statement that he knew his rights even before being advised of these rights also is an indication. Another indication is his volunteering information without questions being asked as well as volunteering that he committed two other crimes and that he had been in prison for bank robbery. Finally, his willingness to sign the waiver of his rights is another circumstance indicating that he did not desire an attorney.

At best his statement that he wanted to call Judge Wiseman and Ms. Wooten was an equivocal request to talk to an attorney. Under the total circumstances that followed this statement, no one would consider this statement a request for counsel.

The findings of fact made by the trial court at the hearing on a motion to sup-

press are binding upon this Court unless the evidence contained in the record preponderates against them. *State v. Ross,* 49 S.W.3d 833, 839 (Tenn.2001). The defendant has the burden of demonstrating that the evidence preponderates against the trial court's findings. *State v. Odom,* 928 S.W.2d 18, 23 (Tenn.1996). The application of the law to the facts, however, is a question of law which is reviewed *de novo* on appeal. *State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn.1997).

■ Relying on *Edwards,* Defendant argues that he made an unequivocal request for an attorney at the beginning of the custodial interrogation, and that any statements made after the investigating officer failed to respond to the invocation of his right to counsel should be suppressed. The State contends that Defendant's request was, at best, ambiguous or equivocal based on the totality of the circumstances surrounding the making of Defendant's statement, and the police officers thus had no obligation to cease questioning Defendant about the offenses.

■ The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. An accused's constitutional right to counsel is applicable during custodial interrogations. *See Edwards,* 451 U.S. at 482, 101 S.Ct. at 1883. After an accused invokes the right to counsel during interrogation, all questioning must cease until an attorney is present. *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). Once a suspect indicates "his desire to deal with the police only through

counsel, [the suspect] is not subject to further interrogation by the authorities until counsel has been made available to him unless the [suspect] himself initiates further communication, exchanges or conversations with the police." *Edwards,* 451 U.S. at 484–485, 101 S.Ct. at 1884–85. The United States Supreme Court has interpreted the phrase, "counsel has been made available," to mean "that counsel must be present." *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (citing *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990)).

■ Whether or not an accused has actually invoked his right to counsel during interrogation is an "objective inquiry." *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994). "The accused 'must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer ... would understand the statement to be a request for an attorney.'" *State v. Saylor,* 117 S.W.3d 239, 246 (Tenn.2003) (citing *State v. Huddleston,* 924 S.W.2d 666, 670 (Tenn.1996)). The investigating officers may continue to question an accused if the accused's reference to counsel is ambiguous or equivocal. *Id.*

Based on a careful review of the record and the audio tape of Defendant's statement, we conclude that Defendant's request to call "Judge Wiseman and Ms. Wooten" prior to the initiation of questioning was an unequivocal request for the assistance of counsel. Sergeant Marshall clarified with Defendant that Ms. Wooten was a federal public defender, and Sergeant Marshall acknowledged at the suppression hearing that he knew that federal public defenders were attorneys. Ms. Wooten had previously represented Defendant on a prior unrelated federal charge before Judge Wiseman.

The trial court, in making its determination that Defendant's request for counsel was equivocal, looked to the totality of the circumstances surrounding the interrogation after Defendant made his request, and not on the clarity, or lack thereof, of the request for counsel itself. The United States Supreme Court has concluded, however, that "an accused's subsequent statements are relevant only to the question whether the accused waived the right he invoked," and observed:

> The courts below were able to construe [the accused's] request for counsel as "ambiguous" *only* by looking to [the accused's] *subsequent* responses to continued police questioning and by concluding that "considered in total," [the accused's] *"statements"* were equivocal. (Citation omitted).

*Smith v. Illinois,* 469 U.S. 91, 97, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984).

The Court found such an analysis "unprecedented and untenable," noting that a statement is either a request for counsel or it is not. *Id.* at 97–98, 105 S.Ct. at 494 (citing *People v. Smith,* 102 Ill.2d 365, 80 Ill.Dec. 784, 466 N.E.2d 236, 241 (1983) (Simon, J., dissenting)).

A "totality of the circumstances" analysis, however, is pertinent to determining whether Defendant, having initially requested unequivocally the presence of counsel, subsequently knowingly and intelligently waived that right. The *Edwards* court, however, cautioned that although a suspect may voluntarily and intelligently waive his *Miranda* rights and respond to interrogation, "additional safeguards are necessary when the accused asks for counsel," and "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards,* 451 U.S. at 484, 101 S.Ct. at 1884–85.

Having unequivocally invoked his right to the presence of counsel, Defendant's confession is subject to suppression unless the State first shows that Defendant initiated a subsequent conversation which ultimately led to his confession, and, if he did reopen the questioning, that he made an intelligent and knowing waiver of his right to counsel. *See Davis,* 512 U.S. at 458, 114 S.Ct. at 2354–55; *see also State v. Huskey,* 177 S.W.3d 868, 881 (Tenn. Crim.App.2005) (quoting *Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9) (The proper question is whether the accused, not the police officers reopened the dialogue)).

Thus, after the investigating officers terminate an interrogation following a request for counsel, an accused may later approach the authorities and express a willingness to reopen discussions. *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983). In the case *sub judice,* however, there was no break in the questioning after Defendant made his request to call Ms. Wooten. Sergeant Marshall continued to escort Defendant into the interrogation room and to proceed with questioning as if Defendant had not made a request for counsel, despite the fact that he clarified with Defendant that Ms. Wooten was a federal deputy public defender.

If the questioning continues after the accused has requested counsel, and assuming no break in custody, "the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the [accused] executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil v. Wisconsin,* 501 U.S. at 177, 111 S.Ct. at 2208; *see also Bradshaw,* 462 U.S. at 1045, 103 S.Ct. at 2835 ("There are some inqui-

ries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation.")

A similar situation arose in *State v. Harts*, 7 S.W.3d 78, 84 (Tenn.Crim.App. 1999). In *Harts*, the defendant, against whom a sexual assault complaint had been filed, voluntarily arrived at the police station at the investigating officer's request. The defendant told the investigating officer that "he would rather talk to an attorney about the [allegation]." *Id.* at 82. The defendant was then placed under arrest, and the dialogue between the police officer and the defendant continued until the defendant finally agreed to talk. *Id.* at 84–5. The State argued that the defendant initiated a discussion about the alleged offense after his arrest when he said that he wanted to talk. As this Court observed, "What the State fails to acknowledge, however, is that the questioning never ceased. The detective continued a dialogue with the defendant after he requested an attorney and was placed under arrest." *Id.* at 85. The Court stated:

> We cannot conclude that the defendant knowingly and voluntarily waived his rights and initiated the discussion with the detective when the record shows that the detective maintained a conversation with the defendant, then instructed the defendant on how to clarify the record to ensure that it reflected clear initiation of conversation. This series of events reflects a failure to abide by the *Edwards* requirement that interrogation cease until counsel is present, not an independent initiation of conversation by the defendant.

*Id.*

Based on a careful review of the record, we conclude that Defendant made an unequivocal request for counsel at the beginning of the interrogation, and that, under the facts presented in this case, Defendant did not initiate a discussion about the charged offenses as contemplated in *Edwards* and its progeny. Accordingly, Defendant's statements to Sergeant Marshall should have been suppressed.

■■■ However, we conclude that although the admission of Defendant's statement was error, it was harmless error beyond a reasonable doubt. *See Arizona v. Fulminante*, 499 U.S. 279, 295–96, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991); *State v. Dean*, 76 S.W.3d 352, 371 (Tenn. Crim.App.2001). In this case, apart from Defendant's confession, there was substantial evidence upon which the jury could have found Defendant guilty beyond a reasonable doubt. *See Dean*, 76 S.W.3d at 371. Ms. Peden and Ms. Harney were able to articulate the events which occurred from the time Defendant entered the Keystop store until his departure. The women's descriptions, for the most part, matched the recitation of events reflected in Defendant's statement, except that Defendant did not believe that he had pointed his weapon at Ms. Peden. Mr. Frakes identified Defendant as the perpetrator of the robbery and testified that he did not lose sight of Defendant from the time the two men drove away from the Keystop store until Defendant's car stopped on the interstate, and Defendant ran into the woods. Officer Bates apprehended Defendant approximately six hours after the robbery as he walked across a parking lot located about two and one-half miles from the Keystop store.

Based upon the foregoing and our review of the record, we conclude beyond a reasonable doubt that the erroneous admission of Defendant's statement did not affect the verdict.

## III. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his convictions because none of the witnesses were able to provide a clear description of the perpetrator's clothes, or agree upon whether or not the perpetrator had a beard. Although Mr. Frakes testified that Defendant was approximately six feet, two inches tall, Defendant argues that he is much shorter than this. Defendant points out that the witnesses were not asked to view a line-up, and no fingerprints connecting Defendant to the crime scene were found.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn.Crim. App.1990).

In light of our conclusion that the admission of Defendant's statement to the police was harmless error beyond a reasonable doubt, we will review Defendant's challenge to the sufficiency of the evidence in this case without reference to Defendant's statement.

Defendant was convicted of the aggravated assault of Mr. Frakes. As relevant here, the offense of assault is committed when a person "intentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn.Code Ann. § 39–13–101(a)(2). An assault is aggravated when the person uses or displays a deadly weapon. *Id.* § 39–13–102(a)(1)(B). Mr. Frakes testified that Defendant fired several rounds at Mr. Frakes' vehicle as the two vehicles traveled the interstate. Mr. Frakes stated that he feared that he would suffer bodily injury from the gunfire.

Also as relevant here, Defendant was convicted of the aggravated robbery of Ms. Peden. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39–13–401(a). The offense of robbery is elevated to aggravated robbery when the robbery is accomplished with a deadly weapon. *Id.* § 39–13–402(a)(1). Ms. Peden testified that she opened the cash register to ring up Defendant's purchase, and Defendant told her to give him all of the money in the cash register. Ms. Peden stated that Defendant held a gun in his right hand and grabbed the money out of the cash drawer with his left hand. Ms. Peden avoided eye contact with Defendant because she was terrified.

■ Defendant's primary challenge to the sufficiency of the evidence is directed toward the identification evidence presented at trial. The identity of the perpetrator is an essential element of any crime. *See State v. Thompson,* 519 S.W.2d 789, 793 (Tenn.1975). Although both Ms. Peden and Ms. Harney testified that they could not positively identify the robber because they were afraid to make eye contact with him, Mr. Frakes made an unequivocal in-court identification of Defendant as the perpetrator of the offense. The reliability of an in-court identification depends on the totality of the circumstances, "including the opportunity of the witness to view the offender at the time of the crime, the witness's degree of attention, the accuracy of the prior description of the offender, the level of certainty of the witness at the confrontation, and the length of time between the crime, and the confrontation." *State v. Beal,* 614 S.W.2d 77, 82 (Tenn. Crim.App.1981) (citing *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Rippy v. State,* 550 S.W.2d 636, 639–40 (Tenn.1977)).

■ The identification of the defendant as the person who committed the crime is a question of fact for the jury. *See State v. Strickland,* 885 S.W.2d 85, 87 (Tenn.Crim.App.1993). The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made. *State v. Radley,* 29 S.W.3d 532, 536 (Tenn.Crim.App.1999) (citing *Strickland,* 885 S.W.2d at 87–88).

By its verdict, the jury obviously resolved any issues of identification in favor of Mr. Frakes who unequivocally identified Defendant as the perpetrator of the offenses. Based on the foregoing, we con-clude that a rational trier of fact could have found Defendant guilty of the offenses of aggravated robbery and aggravated assault beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

## IV. Sentencing Issues

In his appeal, Defendant does not challenge the length of his sentences but argues that the trial court erred in ordering Defendant's sentences to be served consecutively based on its finding that Defendant had an extensive record of criminal activity. *See* Tenn.Code Ann. § 40–35–115. Defendant also contends that an effective sentence of twenty three years is not reasonably related to the severity of his current offenses.

The State introduced into evidence Defendant's presentence report and certified copies of Defendant's prior felony convictions at the sentencing hearing. Defendant was charged with leaving the scene of an accident in 1976 in Florida. He was granted post-trial diversion and placed on probation for five years. In 1984, Defendant was convicted of breaking and entering a building in Michigan and sentenced to three years, all of which was suspended with Defendant placed on probation. On August 6, 1993, Defendant entered a plea of guilty to bank robbery in the United States District Court for the Middle District of Tennessee. He was sentenced to thirty-seven months of confinement followed by five years of supervised release.

In addition to his felony offenses, Defendant was convicted of violation of the bad check law in Florida in 1985 and received a six-month suspended sentence. Defendant entered pleas of guilty in Tennessee to criminal trespass in 1993, and two counts of violation of the bad check law in 1997. He was sentenced to eleven months, twenty-nine days for each conviction, and was

placed on probation in each of the three cases. According to the presentence report, a federal detainer warrant was outstanding against Defendant for a bank robbery charge in Williamson County at the time of the sentencing hearing.

Defendant stated in the presentence report that he began using drugs in 1970 when he was fourteen-years-old, including marijuana, cocaine, and heroin. Defendant listed at least fifteen drugs he had used over the years and "could not list one 'street' drug he ha[d] not tried." Defendant admitted he was a drug addict and had participated in several treatment programs from approximately 1970 to 1997. Defendant's brother, David Koffman, told the probation officer that Defendant's family members had assisted and supported him over the years but had "run out of options." Mr. Koffman stated, however, that the family was proud that Defendant had managed to "[stay] out of trouble" for a ten-year period.

Defendant made a statement in his own behalf at the sentencing hearing. He apologized to the court for his conduct. Defendant acknowledged that he had a "very bad drug problem" as indicated in the presentence report and stated that he had been significantly impacted by his parents' deaths. Defendant said, "I just feel bad about a lot of things, you know, and I didn't mean anything that might have happened. I've been very mixed up. I was on a lot of drugs."

 When a defendant challenges the length, range, or manner of service of a sentence, this Court conducts a *de novo* review with a presumption that the determinations made by the trial court are correct. Tenn.Code Ann. § 40–35–401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circum-

stances." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn.1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *Dean,* 76 S.W.3d at 377 (citations omitted). Because the record reflects that the trial court considered the sentencing principles and all relevant facts and circumstances, our review is *de novo* with a presumption of correctness. Tenn.Code Ann. § 40–35–401(d).

 The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. *Id.* § 40–35–401, Sentencing Commission Comments. In conducting a *de novo* review of a sentence, we must consider: (1) the evidence, if any, received at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. *Id.* §§ 40–35–102, –103, and –210; *State v. Smith,* 735 S.W.2d 859, 863 (Tenn.Crim. App.1987).

In determining whether to impose consecutive sentences, the trial court found that Defendant is an offender whose record of criminal activity is extensive. *See* Tenn.Code Ann. § 40–35–115(b)(2). Based on consideration of this factor as well as the nature and circumstances surrounding the commission of the current offenses, the trial court ordered Defendant to serve his sentences consecutively for an effective sentence of twenty-three years.

 Defendant argues that the record does not support a finding that he has an

extensive record of criminal activity. He points out that his felony convictions are more than ten years old, and his most recent convictions were for misdemeanor offenses. Defendant contends that the length of time between offenses also negates a finding that he has an extensive criminal history. Defendant also contends that his effective sentence of twenty-three years does not justly relate to the seriousness of his crimes.

When a Defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40–35–115. The imposition of consecutive sentences is also guided by the general sentencing principles that the length of a sentence be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. §§ 40–35–102(1) and –103(2).

As relevant here, a trial court may impose consecutive sentences if it finds by the preponderance of the evidence that "the defendant is an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40–35–115(b)(2). A defendant's history of criminal convictions is, of course, a part of this determination, and nothing in the statute imposes a time constraint on the trial court's consideration of a defendant's criminal record which spans over a number of years. *See, e.g., State v. Prentice C. Calloway,* No. M2204–0118–CCA–R3–CD, 2005 WL 1307800, *13 (Tenn.Crim.App., at Nashville, June 2, 2005), *perm. app. denied* (Tenn. May 9, 2005) (Criminal activity extended over fifteen years); *State v. William C. Tomlin,* No. M2003–01746–CCA–R3–CD, 2004 WL 626704, *8 (Tenn.Crim.App., at Nashville, Mar. 30, 2004), *perm. app. denied* (Tenn.

Oct. 4, 2004) (Trial court properly considered the defendant's lengthy history of criminal convictions extending from 1977 through 2001).

Moreover, various panels of this Court have previously observed that "an extensive record of criminal activity may include criminal behavior which does not result in a conviction." *State v. William L. Vaughn,* No. M2002–01879–CCA–R3–CD, 2003 WL 21877929, *5 (Tenn.Crim.App., at Nashville, Aug. 1, 2003), *perm. app. denied* (Tenn. Dec. 22, 2003) (citing *State v. William Rhea Jackson,* No. M2002–00762–CCA–R3–CD, 2003 WL 1868654, *4 (Tenn. Crim.App., at Nashville, Mar. 27, 2003), *perm. app. denied* (Tenn. Aug. 12, 2003)). Thus, it was appropriate for the trial court to consider Defendant's admitted use of illegal drugs beginning in 1970 and continuing until he committed the current offenses in 2002. *See Vaughn,* 2003 WL 21877929, at *5 (Trial court properly considered the defendant's acknowledged daily use of illegal drugs for over twenty years in determining that the defendant had an extensive history of criminal activity.); *State v. Percy Wade Cockrill,* No. M2002–00761–CCA–R3–CD, 2003 WL 1787287, *4 (Tenn.Crim.App., at Nashville, Apr. 4, 2003) (In addition to his prior convictions, the defendant's admitted years of marijuana use and to the frequent use of cocaine during the months preceding his arrest supported the trial court's imposition of consecutive sentences on the basis of the defendant's extensive record of criminal activity).

Based on the foregoing, we conclude that the record supports the trial court's finding that Defendant has an extensive history of criminal activity. In addition to finding statutory grounds for the imposition of consecutive sentences, the trial court must also find that the length of the effective sentence imposed is

"justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." The trial court considered the nature of the offenses, particularly the conduct associated with the commission of the aggravated assault offense, in addition to Defendant's criminal history in determining that consecutive sentencing was appropriate.

Defendant robbed Ms. Peden with the use of a gun while Ms. Harney was present. He then engaged in gunfire with Mr. Frakes while the vehicles traveled on the interstate, endangering the lives not only of Mr. Frakes' children, who were passengers in the car, but also the other drivers on the interstate. Defendant blamed his criminal conduct on his use of drugs. Defendant, however, has been offered numerous opportunities over the past thirty years to overcome his drug addiction, which have all proved unsuccessful. Other than a thirty-seven month period of confinement for his federal bank robbery charge, Defendant has been extended probation for his prior criminal offenses. In addition, a federal charge of bank robbery was pending against Defendant at the time of the sentencing hearing. Based on the foregoing, we cannot conclude that the trial court abused its discretion in ordering Defendant to serve his sentences consecutively, and that an effective sentence of twenty-three years for Defendant's offenses is appropriate. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record and based on the foregoing, we affirm the judgments of the trial court.