IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 5, 2018

## STATE OF TENNESSEE v. TYLER BROOKS and TAVARES JACKSON

**Appeal from the Criminal Court for Shelby County**
**No. 16-00942        J. Robert Carter, Jr., Judge**

_____

**No. W2017-00768-CCA-R3-CD**

_____

A Shelby County Criminal Court Jury convicted the Appellants, Tyler Brooks and Tavares Jackson, of aggravated robbery. Additionally, Appellant Jackson was convicted of vandalism of property valued over $500. The trial court sentenced each Appellant to a total effective sentence of nine years in the Tennessee Department of Correction. On appeal, both Appellants challenge the sufficiency of the evidence sustaining their aggravated robbery convictions. Appellant Jackson also contends that the trial court erred by denying his motion to suppress the victim's identification of the perpetrators at the scene, by "denying the defense to enter the case notes of the lead detective," by making prejudicial gestures during trial, and by allowing an officer to give speculative testimony regarding the Appellants' guilt. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Stephen C. Bush and Tony N. Brayton (on appeal), and Joseph Benjamin Baker (at trial), Memphis, Tennessee, for the Appellant, Tyler Brooks.

Shannon M. Davis, Memphis, Tennessee, for the Appellant, Tavares Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie C. Fouche, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

# I. Factual Background

The Appellants' charges stem from the August 21, 2015 vandalism of Gabe's Market and robbery of the victim, Gebeyehu Teklemariam, who owned the market.

At trial, the victim testified that his convenience store, Gabe's Market, was located on Macon Road. Sometime before 11:00 p.m. on August 21, 2015, he received a call from ADT Security Service informing him he needed to go to the store and wait for the police because the store's front doors had been broken.

The victim left home and drove his truck to the store. Upon arrival, he parked, got out, and walked around the outside of the store. Upon seeing broken glass at the side of the building, he returned to his truck and sat inside to wait for the police. When he heard a knock from the rear of the truck, he got out and turned in that direction. He saw two men approaching him from the back of the truck. One of the men "was lighter skinned, a little skinnier and taller. The other one [was] shorter and a little bit chubbier at the time." The taller man pointed a silver gun at the victim and said, "Give me my money. Give me the money." The gunman was wearing a white bandana that covered the lower part of his face. When he spoke, the bandana went "down a little bit." The victim thought the gunman was wearing a button-down shirt and white jeans. The shorter man was wearing a black hoodie and black pants. The victim told the gunman that he did not have any money. The shorter man then ordered, "Give me the money." The victim repeated that he did not have any money. The perpetrators then took the victim's cellular telephone and ran across Macon Road towards "the bush" and "a lot of trees." The victim explained that a subdivision and a school were located on the other side of the trees.

In the courtroom, the victim identified the gunman as Appellant Jackson and the other perpetrator as Appellant Brooks. He asserted that he was certain of his identification. The victim explained that a lot of young people came into his store, that the Appellants had been in the store often, and that he had recognized the Appellants' voices during the offense. The victim described Appellant Brooks' voice as "thicker" than Appellant Jackson's voice. The victim explained that he recognized Appellant Brooks' voice because they had many discussions during Appellant Brooks' visits to the store. The victim knew and liked Appellant Jackson because he had never caused problems in the store and was the only young customer who was a "nice guy."

The victim said that the robbery occurred about five minutes after he arrived at the store and that the police arrived approximately seven to ten minutes later. Upon questioning, the victim told the police that he knew the perpetrators and said that "one of them was kind of light skinned and taller [and had the gun]. The other one was shorter and ha[d] a deep voice." The victim also told the police which way the perpetrators ran.

- 2 -

The victim's store had a surveillance video system, and he provided a copy of that night's video to the police. Some of the officers left the scene, but other officers stayed and watched the security video with the victim. As they watched the video, an officer again asked if the victim knew the perpetrators. The victim responded, "Yes, I know them. They are my customers. I know their families." Ultimately, some officers brought the Appellants to the store, and the victim verified they were the perpetrators. About twenty or thirty minutes later, the officers brought a third man to the store, but the victim said he was not one of the perpetrators.

The victim said that he had seen the Appellants almost daily for approximately four or five years. Appellant Jackson had never given him problems, but he had "some problems" with Appellant Brooks.

The victim said that an air conditioner and breaker at the back of the store had been cut, an "MLGW meter" had been damaged, and a window had been broken. He estimated that the damage would cost over $1,000 to repair.

On cross-examination, the victim said that the store closed at 10:00 p.m. and that he was called by ADT before 10:30 p.m. He recalled that the robbery occurred shortly after he arrived at the store. The victim noted that the cellular telephone the Appellants took from him was never returned.

The victim said that he knew one of the Appellants was wearing a black hoodie. When Appellant Jackson pointed the gun at him, the victim watched his face and did not note the time or look at Appellant Jackson's clothes. The victim thought Appellant Jackson was wearing white pants but acknowledged the security video did not show Appellant Jackson wearing white pants. The victim did not recall testifying at a previous hearing that he initially did not tell the police that he recognized their voices. He could not recall when he told the police he recognized the perpetrators' voices and recalled only that the police asked if he knew the perpetrators and that he said he did. The victim did not know the Appellants' names or nicknames but knew they both lived in the neighborhood.

The victim said that the security video showed three men vandalizing the store but that their faces could not be seen. The victim explained that he was able to recognize the Appellants' voices during the robbery because almost all of the "boys" from the neighborhood frequented his store, the Appellants came to his store almost every day after school, and he frequently had conversations with the Appellants.

The victim noted that Appellant Jackson was "one of [his] favorite boys." Appellant Jackson tried to keep his face covered during the robbery; however, at one point, the victim saw "all the face." The victim said that he did not want to send any

young people to jail but that he had no doubts about his identification of the perpetrators, explaining, "I know them, exactly what they did to me, and who [they are]."

On redirect examination, the victim noted that Appellant Brooks sometimes came into the store with older males and stole items. The victim told Appellant Brooks not to return to the store.

The victim recalled that Appellant Jackson's mask covered the lower part of his face beginning at the middle of his nose. When Appellant Jackson demanded money from the victim, his mask slipped down to his mouth. On recross-examination, the victim said that he was sure of Appellant Jackson's identity even before his mask slipped.

Mark Lowe, a deputy with the Shelby County Sheriff's Office, testified that on the night of August 21, he was off-duty and driving down Macon Road toward Raleigh Lagrange in his personal vehicle when he saw three men come out of a bushy, wooded area. One man returned to the bushes, and the other two men crossed the road and walked into a parking lot. One of the two men had a gun, and Deputy Lowe saw the gunman raise the weapon. Deputy Lowe called the dispatcher to convey what he had seen and included a description of the men's clothing. The dispatcher advised Deputy Lowe that an "alarm" had been called in near that location.

Deputy Lowe drove into the parking lot and saw the two men run back into the bushes. At that time, a marked patrol unit arrived. Deputy Lowe told the other officers what he had seen and asked them to check the subdivision on the other side of the wooded area.

On cross-examination, Deputy Lowe acknowledged that he was not involved in the investigation of the case. At the time, Deputy Lowe was able to give the other officers a description of the men's clothing; however, at trial Deputy Lowe was unable to recall what the men were wearing. Deputy Lowe never saw the men's faces.

Deputy Anthony White testified that he responded to the area to help search for two or three black males who had robbed the store. Twenty or thirty minutes after being dispatched, Deputy White saw a couple of men walking across the street near the intersection of Raleigh Lagrange and McCaleb, which was less than a quarter of a mile from the store where the robbery occurred.

The officers, who were in a marked patrol vehicle, pulled up next to the men and asked where they had been and what they were doing in the area. One of the men "took off running." Deputy White's partner ran after the man and caught him. Deputy White identified Appellant Jackson in court as the man who ran and Appellant Brooks as the

man who stayed behind to speak with the officers. The officers took the Appellants to the victim's store, and the victim identified them as the perpetrators.

Deputy White recalled that the Appellants had cut grass and grass stains on their shoes and clothes. He could not recall what the Appellants were wearing.

On cross-examination, Deputy White recalled that the police dispatcher had given a description of the suspects. Deputy White could recall only that the police were searching for two or three black males. He acknowledged the description would have matched most of the young men in that neighborhood but explained that he did not see any other groups of two or three young men walking together during the search. He stopped the men near the parking lot of Dexter Middle School, which was located between Beringer Drive and Lagrange. The police had not received any trespassing calls from the area, but Deputy White spoke with some people in the area who had seen a couple of "kids" run through the backyards. Deputy White said that it was unusual for young people to be out at that time of night because of the curfew and that when the police found them during curfew checks between 10:00 and 11:00 p.m., they generally took the children home.

Deputy White patted down one of the Appellants while his partner patted down the other one. The officers did not find a gun or a cellular telephone.

Deputy White said that he usually did not take suspects for a show-up identification; however, "[t]he reason we took them back to the store was one of the suspects [took off] running. That's normally an indication of guilt, when they take off running after you just stopped and talked to them." Deputy White did not take the Appellants out of the car at the store but had the victim walk over to the car and look at them through the window.

Detective Andrew Terrell testified that he was the lead investigator and that he and his supervisor went to the store to process the scene and take photographs. Patrol officers located some clothing in a drainage ditch approximately seventy to one hundred yards from the store. Detective Terrell went to the area, took photographs, and collected the evidence. The evidence included several items of wet clothing: a black jacket, black hoodies, black shoes, a black shirt, black pants, and a "piece of white clothing."

Detective Terrell spoke with the victim and asked if he would recognize the perpetrators. The victim immediately responded, "Well, I know who they are." The victim was adamant that he knew who robbed him.

On cross-examination, Detective Terrell said that one of the black shirts appeared to have pink lettering on the front, possibly a "Gap logo." Detective Terrell said that the

victim never described any lettering on the perpetrators' clothing. Detective Terrell explained, however, that the victim "stated that he knew who they were." The victim described the perpetrators as black males who were frequent customers of his store. One of the perpetrators had lighter skin, the other had darker skin, and one was taller than the other. The victim was unable to provide names or nicknames for the perpetrators. Detective Terrell said that he was at the scene at approximately 11:30 p.m. when the Appellants were brought to the store for identification.

Detective Terrell said that he watched the store's surveillance video. He thought the video showed two individuals approaching the store and one of the men shooting out a storefront window.

Detective Terrell acknowledged that he did not compare the size of the clothes found in the drainage ditch to the sizes worn by the Appellants and did not test their hands for gunshot residue.

Tameka Carter, Appellant Brooks' mother, testified that the Appellants were friends and commonly "h[u]ng out" together at her house. On Friday, August 21, the Appellants arrived at her house around 9:00 or 9:30 p.m. and went upstairs to play video games. Carter stayed downstairs watching television. The Appellants left around 10:30 p.m. Usually, Appellant Brooks walked with Appellant Jackson to Dexter Middle School, which was about halfway to Appellant Jackson's home, then returned home for his 11:00 p.m. curfew. Appellant Brooks was wearing a white shirt, blue jeans, and white shoes, and Appellant Jackson was wearing a yellow shirt that "was light and dark" and jeans. Neither boy had a backpack or duffle bag. No one else was with the Appellants that night.

Carter said that the walk from her house to Gabe's Market was a five- to seven-minute walk and from her house to Dexter Middle School was a ten-minute walk. She fell asleep after Appellant Brooks left the house and did not notice he had not returned until she received a call from the police around midnight informing her of his arrest. She gave the police her permission to speak with Appellant Brooks.

Carter said that she would not "make something up to protect [her] son." She knew a lot of neighborhood kids went to Gabe's Market because it was close to a bus stop, that Appellant Brooks had gone to Gabe's Market after school, and that Appellant Brooks had "a couple little run-ins with" the victim. Appellant Brooks told her he had been in a "shoot-out" at the store before the robbery.

The Appellants chose not to testify or present proof. Appellant Brooks was found guilty of the aggravated robbery charge but was acquitted of the vandalism charge. Appellant Jackson was found guilty of both offenses. The trial court sentenced each of

the Appellants to nine years in confinement for the aggravated robbery convictions and imposed a concurrent sentence of one year for Appellant Jackson's vandalism conviction.

On appeal, both Appellants challenge the sufficiency of the evidence sustaining their aggravated robbery convictions.[1] Appellant Jackson also contends that the trial court erred by denying his motion to suppress the victim's identification of the perpetrators at the scene, by "denying the defense to enter the case notes of the lead detective," by making prejudicial gestures during trial, and by allowing an officer to give speculative testimony regarding the Appellants' guilt.

## II. Analysis

### A. Timeliness of Notice of Appeal

Initially, we note that the State contends Appellant Jackson's notice of appeal was untimely. At the time the notices of appeal were filed, Rule 4(a) of the Tennessee Rules of Appellate Procedure required that the notices "be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from[.]"[2] The trial court denied the Appellants' motions for new trial on March 10, 2017. Appellant Brooks filed a timely notice of appeal on April 7, 2017. Appellant Jackson's notice of appeal reflects that it was mailed on April 11, 2017, and filed on April 19, 2017. Therefore, we agree with the State that Appellant Jackson's notice of appeal was untimely.

Regardless, Rule 4 provides that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). We have chosen to waive the timely filing.

### B. Sufficiency of the Evidence

Both Appellants challenge the sufficiency of the evidence sustaining their aggravated robbery convictions, specifically contending that the victim's identification of the Appellants as the perpetrators was not reliable. On direct appeal, a jury conviction removes the presumption of the Appellants' innocence and replaces it with one of guilt, so that the Appellants carry the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellants must establish that no reasonable trier of fact could have found

---

[1] Appellant Jackson does not challenge the sufficiency of the evidence sustaining his vandalism conviction.

[2] Effective July 1, 2017, Rule 4(a), Tennessee Rules of Appellate Procedure, was amended to require that notices of appeal be filed with the appellate court clerk rather than the trial court clerk.

the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

In the light most favorable to the State, the evidence showed that the victim went to his store after his security company advised him the alarm had been activated. After walking around the store to assess the damage, the victim returned to his vehicle to wait for the police to arrive. The victim heard a noise and got out of his vehicle. Two young men with masks over the lower part of their faces approached him, and one of the men pointed a gun at him. The men repeatedly demanded money from the victim. The victim told them that he did not have any money, and the perpetrators took his cellular telephone and then walked toward a wooded area. The victim recognized the Appellants' by their eyes and voices because they were frequent customers of his store. Additionally, Appellant Jackson's mask slipped during the crime, and the victim was able to see more of his face. After the police arrived at the store, the victim described the Appellants, and the police quickly found the Appellants and their discarded clothing a short distance from the store. The police brought the Appellants to the store for a show-up identification, and the victim confirmed that the Appellants were the perpetrators.

- 8 -

Our courts have held consistently that a victim's testimony, standing alone, is sufficient to sustain a conviction of aggravated robbery. See State v. Koffman, 207 S.W.3d 309, 322 (Tenn. Crim. App. 2006); State v. Radley, 29 S.W.3d 532, 536 (Tenn. Crim. App. 1999); State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993). Moreover, it was within the jury's purview to determine the credibility of the witnesses. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the evidence was sufficient to sustain the Appellants' convictions of aggravated robbery.

## C. Suppression of Identification

Appellant Jackson contends that the trial court erred by denying his motions to suppress the victim's identification of the Appellants. However, the record does not include a transcript of the suppression hearing or the trial court's order ruling on Appellant Jackson's motions. An appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). We conclude that Appellant Jackson has waived this issue.

## D. Detective Terrell's Case Notes

Next, Appellant Jackson contends that the trial court erred by "denying the defense to enter the case notes of the lead detective." As the State notes in its brief, at trial Appellant Jackson indicated that the notes would help Detective Terrell recall what the victim said about his past experience with each of the Appellants. Appellant Jackson further indicated that he wanted to introduce the case notes as substantive evidence. The State objected, explaining that an audio recording of the victim's description of the perpetrators was given to the Appellant. However, the case notes and a supplement to the notes reflected that the victim identified Appellant Brooks as his "friend" and Appellant Jackson as the person he had barred from his store while the audio recording and the police report reflected that the victim identified Appellant Jackson as his "favorite boy" and Appellant Brooks as someone who caused trouble in the store. The State explained that the defense was given the audio recording but wanted to use the supplement instead of the recording. The trial court excluded the evidence holding that it was hearsay and not relevant.

On appeal, however, Appellant Jackson argues that he "attempted to attack the credibility of the lead detective by refreshing the witness's memory, by introducing his case notes" and that the case notes should have been admitted into evidence. Appellant Jackson does not explain how the case notes were admissible or what information in the case notes he wanted to use. See Vern Braswell v. State, No. W2016-00912-CCA-R3-PC, 2018 WL 1719443, at *52 (Tenn. Crim. App. at Jackson, Apr. 9, 2018), perm. to appeal denied, (Tenn., Sept. 14, 2018); State v. Jeffrey Scott Long, No. E2015-01287-CCA-R3-CD, 2017 WL 2958700, at *16 (Tenn. Crim. App. at Knoxville, July 11, 2017), perm. to appeal denied, (Tenn., Nov. 16, 2017).

In his brief, Appellant Jackson quotes two exceptions to the rule against hearsay, namely Tennessee Rule of Evidence 803(5), which concerns recorded recollection, and Rule 803(6), which concerns business records. After quoting the rules, Appellant Jackson, without further argument, contends that "[i]n each of the above rules of evidence, the case notes of the Officer could have been admitted." Appellant Jackson next quotes Rule 806, which provides for the impeachment of hearsay declarants. Appellant Jackson, without further explanation or argument, states that "rule 806 gives credence to the argument by the Defense that [Appellant Jackson] was trying to attack the credibility." In our view, the mere quotation of Rules of Evidence followed by summary contentions that the Rules support the Appellant's position does not constitute an argument as required by the Rules of Appellate Procedure. Therefore, the issues are waived. Tenn. R. App. P. 27(a)(7) ("The brief of the appellant shall contain . . . [a]n argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on."); see Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); State v. John Calvin Sipe, Jr., No. E2005-00039-CCA-R3-CD, 2005 WL 3479288, at *7 (Tenn. Crim. App. at Knoxville, Dec. 16, 2005).

Regarding Appellant Jackson's claim that the trial court prevented counsel from proceeding with her line of questioning and failed to allow her to "give any arguments regarding the validity [sic]," the record reveals that the trial court gave counsel ample opportunity to explain the argument for the admissibility of the case notes, and she was unable to do so. Indeed, the trial court patiently attempted to explain the specific rules and the problems with the manner in which counsel was attempting to use the documents. Appellant Jackson is not entitled to relief on this issue.

E. Trial Court's Gestures

Next, Appellant Jackson complains that the trial court made prejudicial gestures during trial. His entire argument on appeal regarding this issue is as follows:

> Under Judicial Canon 1, the law states, "A judge shall uphold and promote the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."
>
> During the course of the trial, the Trial Court Judge made facial gestures that were negative towards the defense. These included, but not limited to [sic], eye rolling, smirks, and the like. The jury saw this, and it tainted the jury.

This court previously has observed that "[i]t is difficult to assess allegations regarding body language and sarcasm. The written record rarely provides an accurate reflection of any such behavior. That is the case here as well." State v. John Knapp, No. 02C01-9608-CR-00282, 1997 WL 759433, at *6 (Tenn. Crim. App. at Jackson, Dec. 10, 1997). Appellant Jackson did not object contemporaneously to any alleged facial gestures made by the trial court and did not provide any citations to the record where such gestures allegedly occurred. We conclude that Appellant Jackson's failures result in a waiver of this issue. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

## F. Deputy White's Testimony

Appellant Jackson's final complaint concerns whether the trial court erred by overruling an objection he made during Deputy White's testimony. On cross-examination, Appellant Brooks' counsel questioned Deputy White about why he took the Appellants to the victim's store for a show-up identification. At that point, the following colloquy occurred:

> [Appellant Brooks' counsel]: Is that typically how you would approach somebody for identification of a suspect, take people for a showing like that?
>
> [Deputy White]: Negative, sir.
>
> [Appellant Brooks' counsel]: Why did you do that that evening?
>
> [Deputy White]: The reason we took them back to the store was one of the suspects running. That's normally an

indication of guilt, when they take off running after you just
stopped and talked to them.

Appellant Jackson objected to Deputy White's testimony.  The trial court overruled the objection and instructed the jury that they would be responsible for determining whether a person's guilt could be inferred from his fleeing from police.

On appeal, Appellant Jackson summarily argues that the trial court should have sustained his objection, explaining that he objected on the basis of speculation.  He further contends the jury was so tainted by hearing the testimony that it was rendered "unfit to rule on a sentence."

However, Appellant Jackson provided no argument or citations in support of his issue.  Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."  Tenn. Ct. Crim. App. R. 10(b); <u>see also</u> Tenn. R. App. P. 27(a)(7).  We conclude that Appellant Jackson has waived this issue.

### III.  Conclusion

The judgments of the trial court are affirmed.

_____
NORMA MCGEE OGLE, JUDGE