# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 30, 2011 Session

## STATE OF TENNESSEE v. KEVIN ANTHONY DICKSON, JR.

**Direct Appeal from the Circuit Court for Sevier County**
**No. 13010-II      Richard R. Vance, Judge**

**No. E2010-01781-CCA-R3-CD - Filed June 14, 2012**

The Defendant, Kevin Anthony Dickson, Jr., was found guilty by the Sevier County Circuit Court of two counts of attempted first degree murder, a Class A felony, especially aggravated burglary, a Class B felony, two counts of aggravated assault, a Class C felony, and attempted aggravated robbery, a Class C felony. See T.C.A. §§ 39-13-202 (2010), 39-14-404 (2010), 39-13-102 (2006) (amended 2009, 2010, 2011), 39-13-402 (2010), 39-12-101 (2010). The trial court merged one count of aggravated assault into an attempted first degree murder conviction. The Defendant was sentenced as a Range I, standard offender to twenty-five years for each attempted first degree murder conviction, twelve years for especially aggravated burglary, and six years each for the aggravated assault and attempted aggravated robbery convictions. The trial court ordered the attempted first degree murder convictions to be served consecutively, for an effective sentence of fifty years. On appeal, the Defendant contends that (1) the evidence is insufficient to support his attempted first degree murder convictions, (2) his conviction for especially aggravated burglary is barred by Tennessee Code Annotated section 39-14-404(d), and (3) the trial court erred by applying improper sentencing enhancement factors and ordering partially consecutive sentences. We affirm the judgments for the attempted first degree murder of Christopher Lyons, aggravated assault, and attempted aggravated robbery. We reverse the judgments for the attempted first degree murder of Rodney Hardin and especially aggravated burglary and remand the case for sentencing and entry of judgments of conviction for attempted second degree murder and aggravated burglary.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part and Reversed in Part; Case Remanded.**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JOHN EVERETT WILLIAMS, J., filed a separate opinion concurring in part and dissenting in part.

Rolfe A. Straussfogel, Sevierville, Tennessee, for the appellant, Kevin Anthony Dickson, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; James Dunn, District Attorney General; and Emilee Abbott, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to an altercation in which the Defendant and two other men forced their way into the home of the victims, shot two of them, and beat a third with a metal baton. At the bench trial, Rodney Hardin testified that he had never met the Defendant before the incident on January 6, 2008. He went to the home of Christopher Lyons that night around 10:15 p.m. to place a bet on a football game. He remained in the home for a few minutes and heard a knock on the door as he prepared to leave. He said that a group of men kicked open the door as he attempted to open it and that he grabbed the first man who came through the door. He said the man was armed with a baton and either brass knuckles or a knife. Mr. Hardin was shot as he struggled with the intruder and fell to the floor. He said that the men yelled, "[W]here's the money, where's the drugs," as he lay on the floor and that the man with the gun said he would fill Mr. Hardin "full of holes." He said the men were in the home for five or ten minutes before leaving.

Mr. Hardin testified that he was paralyzed as a result of the attack and that his spine and nerves were cut "in half." He was in the hospital for about three months and had to have his spleen and a kidney removed. He said he was unable to continue working and no longer could provide for his three children.

On cross-examination, Mr. Hardin agreed that he had not met the Defendant or the other intruders before the attack. He agreed the incident occurred in a small cabin and said about ten people were in the cabin at the time. He said that the door was kicked in as he turned the door knob and that he briefly struggled with the first man through the door before he heard two gunshots and fell to the floor. He was not sure what the men did next because he was focused on his injury. He agreed that the man who threatened to shoot him again was African-American and that he only saw two intruders.

Christopher Lyons testified that in January 2008, he lived in a small log cabin with his twin brother, Anthony Lyons, Joanna Harris, Christopher Gossett, Mr. Gossett's girlfriend, and Dustin Patterson. He said that he met the Defendant a few weeks earlier and that he "partied" with the Defendant and others on New Year's Eve. He said Johnny Ramirez accompanied the Defendant to the cabin on December 31, 2007. He said that the Defendant had between "an eight ball or a quarter of an ounce" of cocaine that night, that he sold

ecstacy pills to the Defendant on behalf of Mr. Gossett, and that both he and the Defendant used the cocaine and ecstacy.

Christopher Lyons testified that on January 6, 2008, he heard a knock on his front door but did not answer it because the person on the other side did not identify himself. He said the Defendant pushed the door in when Mr. Hardin opened it to see who was outside. He said that the Defendant was armed with a police baton and brass knuckles and that the Defendant swung the baton at Mr. Hardin. He said he heard a gunshot after Mr. Hardin grabbed the Defendant's arms. He said that Mr. Hardin fell to the floor and that the Defendant chased Anthony Lyons to the bathroom and struck him with the baton. He said he saw Mr. Ramirez standing near the front door holding a gun and Jessie Davis and the Defendant chasing after Anthony Lyons. He said Mr. Ramirez shot him as he attempted to flee upstairs. He said that the Defendant and Mr. Davis demanded money and drugs and yelled, "we're going to kill you guys if you don't tell us where it's at . . . we've already shot a couple of your boys, we're going to kill you all . . . ." He said the Defendant and the other men remained in the cabin for only a few minutes before leaving.

Christopher Lyons testified that the bullet struck his leg and "shattered" his femur. He had a steel rod placed in his leg and screws placed in his knee and hip. He experienced pain in his leg daily. He spoke with the police and provided a statement while in the hospital.

On cross-examination, Christopher Lyons agreed that people used drugs at his home on New Year's Eve and that he did not have additional contact with the Defendant until the attack on January 6, 2008. He said Mr. Gossett sold cocaine to the Defendant on January 5 and agreed that Mr. Gossett sold drugs for a living and that Anthony Lyons facilitated the transaction between Mr. Gossett and the Defendant.

Christopher Lyons agreed that he and the Defendant stood near Mr. Hardin when the first shot was fired and that the Defendant ran by him and chased Anthony Lyons after Mr. Hardin fell to the floor. He said that the Defendant did not have a gun and that Mr. Ramirez pointed the gun at him and had a "blank" face before shooting him. He did not see Mr. Davis holding a weapon. He agreed the death threats occurred after he and Mr. Hardin were shot. He did not know if he told the police that the Defendant threatened to kill the persons in the cabin or if he mentioned the threat during his testimony at the preliminary hearing. He said that he could not see who yelled the threat but that he heard it. He did not know if the Defendant or the other men took anything from the cabin because he was evicted and his possessions were discarded while he was in the hospital. He agreed the entire altercation lasted only a few minutes. He agreed he told the police that he thought the attack was due to the Defendant's being upset about the quality of the cocaine the Defendant bought from Mr. Gossett the previous night.

-3-

Anthony Lyons testified that he lived in a cabin with his brother in January 2008. He met the Defendant three or four times before the incident on January 6, 2008. He said that he saw the Defendant at a bar on January 5 and that the Defendant asked to buy ecstacy. He said the Defendant came to his home and purchased ecstacy and one-quarter of an ounce of cocaine from Mr. Gossett. He said the Defendant and Mr. Gossett initially argued over the weight of the cocaine but resolved the argument after Mr. Gossett agreed to charge fifty dollars less. He did not see the Defendant again until the attack.

Anthony Lyons testified that on January 6, 2008, the Defendant burst through his front door as Mr. Hardin began to open it. He said that the Defendant was armed with a police baton and brass knuckles, that Mr. Hardin grabbed the Defendant's arms, and that he heard a gun shot. He said that he ran to the bathroom after seeing Mr. Hardin fall to the floor and that the Defendant chased him and hit him in the head with the baton. He said that his wife and Chris Bond were in the bathroom and that they attempted to close the door as the Defendant continued to swing the baton. He said that the Defendant hit him with the baton about fifteen times and that he feared for his life. He said that he heard the Defendant demand money and state, "If they don't come out they're dead," and that he heard another man demand money and drugs. He and his wife escaped through the bathroom window and hid in the woods. As he was hiding, he saw the Defendant, Mr. Ramirez, and a black male run through the woods and drive away in a blue Subaru. He was treated at the hospital for a cut on his head and contusions on his arms and legs.

On cross-examination, Anthony Lyons testified that he met the Defendant before the New Year's Eve party at his home. He said that the Defendant bought cocaine from Mr. Gossett at about 2:00 a.m. on January 6, 2008, and that he did not see the Defendant again until the incident that night. He agreed that the Defendant was not armed with a gun during the attack and that he fell into the bathroom when the Defendant struck him in the head with the baton. He said that he did not see the Defendant make threats but that he heard the Defendant and recognized his voice. He agreed that he heard the Defendant state, "If they don't come out they're dead." He acknowledged his preliminary hearing testimony that he thought Mr. Ramirez fired the gun because Mr. Ramirez was scared after seeing how many people were present in the cabin. He agreed that the Defendant could have been shot "as easily as anybody else" while the Defendant fought with Mr. Hardin. He said he did not injure himself when he jumped out the window and fled the cabin. He did not know of anything that was missing from the cabin after the attack.

Sevier County Sheriff's Detective Matthew Cubberley testified that he investigated the attack on January 6, 2008. He arrived at the victims' home at 10:54 p.m. and spoke with Anthony Lyons and Mr. Gossett, who identified the Defendant and told him where the Defendant lived. Mr. Hardin and Christopher Lyons had already been taken to the hospital

when he arrived. He said he took photographs of the cabin, spoke with witnesses, and recovered .45 caliber shell casings from the cabin.

Detective Cubberley testified that he and other officers drove to the Defendant's home but did not find him there. He said he spoke with a person nearby who stated that he gave the Defendant a .45 caliber gun. Detective Cubberley said the Defendant was arrested the next day and taken to the Sevier County Sheriff's Office. He said that the Defendant gave a statement to Captain Jeff McCarter and Detective Jeff Manis but that he was not present during the statement. He said that he spoke with Mr. Hardin and Christopher Lyons while they were in the hospital and that each identified the Defendant as a person who was involved with the attack. He did not recover any of the weapons used in the attack.

On cross-examination, Detective Cubberley testified that the Defendant did not resist arrest. He said three .45 caliber shell casings were found at the cabin and agreed that the casings were found on the porch and just inside the front door. He said that although he spoke with Anthony Lyons at the scene, Mr. Lyons did not provide a written statement. He agreed his investigation revealed that the attack was related to a drug transaction the previous day and that Anthony Lyons was the primary target. He agreed witnesses described the incident as "chaotic." He agreed little blood was found on the victims' clothing or in the cabin but said neither victim had an exit wound. He agreed the police did not find the third bullet that did not strike anyone. He agreed that the police originally thought the case against the Defendant involved an aggravated assault but that the Defendant was charged with attempted first degree murder after the police spoke with Mr. Davis. He agreed the police did not determine if anything was taken from the cabin during the attack.

Sevier County Sheriff's Captain Jeff McCarter testified that he investigated the incident at the victims' home. He said that he interviewed the Defendant on January 7, 2008, and that he read the Defendant his Miranda rights and obtained a signed waiver of those rights before the interview began. He said that the Defendant provided a lengthy statement lasting one and one-half hours and that the statement was recorded. The recording was played for the court.

On cross-examination, Captain McCarter agreed his investigation revealed that Mr. Ramirez fired the gun that injured the victims. He said that Mr. Ramirez fled the state after the attack but that the Defendant did not leave Sevier County.

Sevier County Sheriff's Deputy Leslie Franklin testified that she was the first officer to respond to the victims' cabin on January 6, 2008. She said the scene was "hectic" and people were screaming. She saw Mr. Hardin lying face down on the floor and gasping for air, saw Christopher Lyons with a gunshot wound in his leg, and found Anthony Lyons lying

on the ground outside the cabin. She said Anthony Lyons told her he had been beaten with a baton. On cross-examination, Deputy Franklin testified that she did not have any contact with any of the defendants.

Laura Patrick, a Wal-Mart employee, testified that the store sold .45 caliber bullets to the Defendant on January 6, 2008. She identified the sales receipt and agreed the ammunition was sold to the Defendant at 8:08 p.m.

Levi Morton testified that he was the intake officer at the jail for the sheriff's department. He said that during intake, the Defendant stated that "he wasn't a snitch and that the guy got what he deserved for selling him bad drugs and he didn't care if he was paralyzed or what happened to him." He said that the Defendant volunteered the statement and that it was not in response to any question posed to the Defendant. On cross-examination, Officer Morton testified that immediately before the Defendant made the statement, the Defendant was asked to identify a Hispanic man at the jail and confirm that the man was involved with the attack. Officer Morton did not know any of the victims in this case.

The Defendant testified that he went to the victims' cabin on January 6, 2008, to retrieve his money from Anthony Lyons, who he thought sold him "fake dope." He said that he did not have a plan and that he brought Mr. Ramirez and Mr. Davis with him to prevent his being "jumped" for asking drug dealers for a refund. He said he never discussed killing or shooting anyone. He said that Mr. Ramirez had a gun and that Mr. Davis had an air pistol. He said he borrowed the gun from a friend in exchange for ammunition the Defendant promised to purchase for the friend. He said the gun was for protection.

The Defendant testified that he knocked on the door and identified himself in a low voice after someone inside asked who was at the door. He said that he heard laughing inside and someone say he would not open the door but that a man eventually opened the door. He said that he yelled at Anthony Lyons to return the money and that Mr. Lyons "swung" at him and he swung back "out of reaction." He said that Mr. Hardin grabbed his arms, that he struggled to free himself, and that he heard muffled gunshots. He said that Mr. Hardin released him and that he chased Anthony Lyons to the bathroom. He said that he placed his foot in front of the bathroom door to prevent it from being closed and that he swung the baton at Anthony Lyons while Mr. Lyons kicked him in the stomach. He said he did not hit Mr. Lyons with the brass knuckles. He said he stopped hitting Mr. Lyons, walked to the middle of the cabin, and yelled, "I want my f------ money back." He said that he went upstairs to search for Mr. Gossett and that he passed Christopher Lyons, who was lying in the fetal position on the staircase.

The Defendant testified he was not sure if anyone had been shot until he was arrested, when the police told him that Mr. Hardin was paralyzed and that Christopher Lyons had been shot in the leg. He said he did not fire the gun or see Mr. Ramirez point the gun at anyone. He said Mr. Ramirez fled after the gun was fired. After the incident, he encountered Mr. Ramirez near the Defendant's car, and they drove away.

The Defendant agreed that he repeatedly mentioned in his statement to the police that the altercation caused him to "snap." He said that although he had reached that level of anger previously and had been in fights, he never attempted to shoot anyone. He agreed he told the police, "If I would have went over there by myself, I'll be honest with you all, wouldn't nobody have been alive in that house." He said that the statement was an exaggeration, that he was upset when he spoke with the police, and that he really meant if he had gone by himself he would have been scared about the possibility of being attacked. He said that he did not discuss firing the gun with Mr. Ramirez or Mr. Davis but agreed he told the police that "everybody said it was just supposed to be a shot in the air just to scare people . . . ." He agreed he told the police that "these two dudes got f----- up. That is worth more than all the money I lost." He said that the statement was made out of anger and that he never intended to kill anyone.

On cross-examination, the Defendant testified that he parked his car about fifty yards away from the cabin. He said he gave the gun to Mr. Ramirez because he did not want to have it in the event that he were in a fight. He said that he told Mr. Ramirez to hold the gun for him but that he did not tell Mr. Ramirez to do anything with the gun. He said that Mr. Ramirez and Mr. Davis suggested he get the gun and the air pistol and that it was not his idea. He agreed he got the gun from a man named Matt about four hours before going to the cabin. He said that the gun contained bullets when Matt gave it to him but that he had to buy more bullets for Matt in order to borrow the gun. He agreed he did not tell the police that the bullets he bought were for Matt and not for the gun on the night of the attack. He said the gun was for protection in case the victims attempted to use a gun. He did not know what happened to the gun after he left the cabin.

The Defendant testified that he went to the cabin to request a refund and that he held the baton and brass knuckles in his pockets. He agreed the victims did not give him permission to enter the cabin but said it was not required because they knew him and he had previously been to the home. He denied pushing the door when Mr. Hardin opened it. He admitted hitting Anthony Lyons with the baton three times near the front door but did not know how many times he struck Mr. Lyons in the bathroom. He said he did not know who was injured during the attack because everyone in the house was on the floor after Mr. Ramirez fired the gun. He said he was upset and trying "to get stuff off [his] chest" when he gave his statement to the police.

-7-

Upon this evidence, the trial court found the Defendant guilty of two counts of attempted first degree murder, especially aggravated burglary, two counts of aggravated assault, and attempted aggravated robbery. The court sentenced the Defendant to an effective fifty-year sentence. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his convictions for attempted first degree murder because it did not establish that he acted with premeditation. He argues that premeditation was negated by evidence showing that he fired no shots, that shots were not fired until a confrontation began, that he pursued only Anthony Lyons and did not inflict life threatening injuries, and that his statement to the police was emotional. The State contends that the evidence of premeditation was sufficient. We conclude that the evidence is sufficient to support the Defendant's conviction for the attempted first degree murder of Christopher Lyons but is not sufficient to support the conviction for the attempted first degree murder of Rodney Hardin.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the trier of fact. See <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree murder is the unlawful "premeditated and intentional killing of another." T.C.A. §§ 39-13-201, -202(a)(1) (2010). Premeditation is "an act done after the exercise of reflection and judgment." <u>Id.</u> 39-13-202(d). The intent to kill must be formed before the act itself but it is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. <u>Id.</u> The existence of premeditation is a question for the trier of fact and may be established by the circumstances surrounding the killing, including "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." <u>Bland</u>, 958 S.W.2d at 660 (citing <u>State v. Brown</u>, 836 S.W.2d 530, 541-42 (Tenn. 1992); <u>State v. West</u>, 844 S.W.2d 144, 148 (Tenn. 1992)).

A person commits criminal attempt who

acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a)(1)-(3) (2010). A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Id. § 39-11-106(a)(20).

Taken in the light most favorable to the State, the record reflects that early on the morning before the attack, the Defendant went to the home of Anthony Lyons and purchased ecstacy and one-quarter of an ounce of cocaine from Mr. Gossett. The Defendant became upset after concluding that the substance was not cocaine. Later that day, the Defendant armed himself with brass knuckles and a baton. The Defendant borrowed a .45 caliber pistol from a friend about four hours before the attacks and bought .45 caliber bullets at 8:08 p.m. The police found three .45 caliber shell casings at the cabin. The Defendant asked Mr. Ramirez and Mr. Davis to accompany him to the victims' cabin and armed Mr. Ramirez with the .45 caliber pistol and Mr. Davis with an air pistol. Although the Defendant testified at the trial that he did not discuss firing the gun with Mr. Ramirez or Mr. Davis, in his statement to the police he stated that he told Mr. Ramirez to "shoot in the air so they know we are serious . . . everybody said it was just supposed to be a shot in the air just to scare people man and it went wrong."

Mr. Hardin testified that at around 10:15 p.m., a group of men kicked open the door to the cabin. He said he grabbed the first man who came through the door, the Defendant. Mr. Hardin was shot in the spine shortly after he grabbed the Defendant's arms. Christopher Lyons testified that Mr. Hardin fell to the floor and that the Defendant chased Anthony Lyons to the bathroom and struck him with the baton. Christopher Lyons saw Mr. Ramirez standing

-9-

near the front door holding a gun, and Mr. Ramirez shot Mr. Lyons as he attempted to flee upstairs. Mr. Lyons said the Defendant and Mr. Davis demanded money and drugs and yelled, "we're going to kill you guys if you don't tell us where it's at . . . we've already shot a couple of your boys, we're going to kill you all . . . ." Anthony Lyons testified that he ran to the bathroom after seeing Mr. Hardin fall to the floor and that the Defendant chased him and hit him in the head with a metal baton. He said that the Defendant hit him with the baton about fifteen times and that he feared for his life. He said that he heard the Defendant demand money and state, "if they don't come out they're dead."

After the Defendant was arrested, an intake officer at the jail heard the Defendant state that "the guy got what he deserved for selling him bad drugs and he didn't care if he was paralyzed or what happened to him." The Defendant agreed he told the police that "these two dudes got f----- up. That is worth more than all the money I lost." He agreed he told the police that everyone in the cabin would have died if he had gone to the cabin alone, but he said the statement was an exaggeration.

The Defendant claims that premeditation is negated by evidence showing that he did not fire the shots, the shots were fired only after a confrontation began, that he pursued only Anthony Lyons and did not inflict life threatening injuries, and that his statement to the police was emotional. We disagree. Premeditation was a question of fact to be resolved by the trier of fact and could be established by the circumstances surrounding the killing. See Bland, 958 S.W.2d at 660. The Defendant spent hours preparing for his return to the cabin before the attack occurred, including obtaining deadly weapons, ammunition, and seeking out the help of Mr. Ramirez and Mr. Davis. Mr. Ramirez and the Defendant used deadly weapons on unarmed victims. The Defendant threaten to kill everyone in the cabin if he did not receive money. Although the Defendant did not fire the gun and only attacked Anthony Lyons, the Defendant was criminally responsible for the shootings because he sought out Mr. Ramirez's assistance and armed Mr. Ramirez with a gun before going to the cabin. See T.C.A. § 39-11-402 (2010) (A person is criminally responsible for an offense committed by another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."). The Defendant's giving an emotional statement to the police the day after the crimes does not establish his state of mind before and during the shootings. We conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendant acted with premeditation.

Although we conclude that the evidence was sufficient to establish that the Defendant acted with premeditation, this does not end our inquiry. As noted above, the Defendant was found to be criminally responsible for the actions of the shooter, Mr. Ramirez. See T.C.A.

§ 39-11-402. In applying the provisions of Tennessee Code Annotated section 39-11-402, our supreme court has stated that

> In order to aid and abet another to commit a crime, it is necessary that [the] accused in some sort associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree; the same criminal intent must exist in the minds of both.

State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997). As a result, to convict the Defendant of attempted first degree premeditated murder, the evidence at the trial had to establish that Mr. Ramirez acted with premeditation when shooting the victims.

The record reflects that Mr. Hardin grabbed the Defendant as soon as the door opened and that Mr. Ramirez immediately shot Mr. Hardin. Although Mr. Ramirez used a deadly weapon on Mr. Hardin and failed to render aid to him, such circumstances are not sufficient under the facts of this case to establish beyond a reasonable doubt that Mr. Ramirez shot Mr. Hardin after the exercise of reflection and judgment. Mr. Ramirez did not testify at the trial, and there is no evidence showing that he said anything at the scene or to the police that would indicate he acted with premeditation. Anthony Lyons acknowledged that he testified at a preliminary hearing that he thought Mr. Ramirez fired the gun because Mr. Ramirez was scared after seeing how many people were present in the cabin. There is no evidence that Mr. Ramirez assisted the Defendant in planning the Defendant's return to the cabin, other than suggesting the Defendant obtain a gun. There is likewise no evidence that Mr. Ramirez asked to hold the Defendant's gun or that Mr. Ramirez indicated he intended to shoot anyone. Despite the evidence being insufficient to establish premeditation with respect to Mr. Hardin, we conclude that the evidence was sufficient to establish an attempted second degree murder. See T.C.A. § 39-13-210 (Second degree murder is a "knowing killing of another.").

We also conclude that the evidence is sufficient to allow a rational trier of fact to find that Mr. Ramirez shot Christopher Lyons after the exercise of reflection and judgment. As noted above, the intent to kill must be formed before the act itself but it is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. T.C.A. § 39-13-202(d). The record reflects that after shooting Mr. Hardin, Mr. Ramirez turned his attention to Mr. Lyons and shot Mr. Lyons as he attempted to flee, a circumstance permitting an inference of premeditation. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) ("Some facts which may be indicative of the existence of premeditation include . . . the shooting of the victim after he had turned to retreat or escape."). Mr. Lyons testified that he heard a gunshot and saw Mr. Hardin fall to the floor. He said that he saw Mr.

Ramirez standing in the doorway as the Defendant chased Anthony Lyons to the bathroom and that Mr. Ramirez shot him as he attempted to flee upstairs. Although the time frame during which the victims were shot was short, the record reflects that Mr. Ramirez singled out a fleeing victim before firing his second shot.

We conclude that the evidence was sufficient to support the Defendant's conviction for the attempted first degree murder of Mr. Lyons. However, because the evidence was not sufficient to support the conviction with respect to Mr. Hardin, we reverse that conviction and remand to the trial court for sentencing and the entry of a judgment of conviction for attempted second degree murder.

## II

The Defendant contends that his conviction for especially aggravated burglary is prohibited under Tennessee Code Annotated section 39-14-404(d). The State concedes that this conviction was improper. We agree.

Tennessee Code Annotated section 39-14-404(d) states that "[a]cts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." T.C.A. § 39-14-404(d). "Subsection (d) prohibits using the same act to prosecute for especially aggravated burglary and another offense." State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993); see also State v. Jehiel Fields, No. 03C01-9607-CC-00261, Bradley County (Tenn. Crim. App. Mar. 18, 1997) (holding that Tennessee Code Annotated section 39-14-404(d) precluded simultaneous convictions for especially aggravated burglary and first degree murder). The appropriate remedy for improper simultaneous convictions under Tennessee Code Annotated section 39-14-404(d) and other applicable sections is to modify the especially aggravated burglary conviction to aggravated burglary. See id.

Here, the effect of Tennessee Code Annotated section 39-14-404(d) is that the Defendant could not be simultaneously convicted of especially aggravated burglary and attempted first degree murder when the act of attempting to kill the victims constituted the "serious bodily injury" that was used to enhance the burglary offense to especially aggravated burglary. Accordingly, the Defendant's conviction for especially aggravated burglary must be modified to aggravated burglary, and we remand for sentencing on the aggravated burglary conviction.

# III

The Defendant contends that the trial court erred by applying improper sentencing enhancement factors and ordering partially consecutive sentences. The State contends that the trial court properly sentenced the Defendant after considering all relevant factors.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210. From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

The determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

(2) The defendant is an offender whose record of criminal activity is extensive; [or]
. . .
(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

Only one criterion is needed to support the propriety of consecutive sentences. See State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). If the trial court finds that the defendant is a "dangerous offender" pursuant to Tennessee Code Annotated section 40-35-115(b)(4), the court must also determine that "an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). "[T]hese two 'limitations' go beyond the definition of a dangerous offender and channel the types of aggravating circumstances that

are required in order to impose consecutive sentences." State v. Tadaryl Darnell Shipp, No. 03C01-9907-CR-00312, Knox County, slip op. at 3 (Tenn. Crim. App. Mar. 21, 2000).

At the sentencing hearing, Rodney Hardin testified that before the attack, he was independent and worked as an electrician to support his three children. He said that after being shot, he had to depend on others, was unable to work or play sports with his children, and experienced constant pain. He did not know if he would be able to walk again. He said his medical bills exceeded $300,000. On cross-examination, Mr. Hardin agreed that he had never met the Defendant before the attack.

Christopher Lyons testified that before the attack, he was in good physical health and spent long periods of time on his feet while working as a bartender and waiter. He said that he was not able to support weight on his injured leg and that he experienced constant pain. He said that he was unable to continue his job as a waiter and that his medical bills exceeded $10,000. He said stress from the injury and memories of the attack made it hard for him to sleep. On cross-examination, Christopher Lyons testified that he no longer had to attend physical therapy for his leg but that he was still under a doctor's care.

Anthony Lyons testified that the Defendant hit him in the head and body with a metal baton during the attack, causing many contusions. He said that he experienced depression and anxiety after the attack and that he no longer slept well. He said his medical bills were about $2,000. On cross-examination, Anthony Lyons testified that after leaving the hospital, he did not see a doctor for his physical injuries but that he saw a psychiatrist about the mental trauma caused by the attack.

Laurisa Dugger testified for the defense that she was engaged to the Defendant. She said that she had known the Defendant for about nine years and that they had a child together. She said that the Defendant was not a violent person and that he worked two jobs to support her. She said it was difficult to support her family without the Defendant's help. On cross-examination, Ms. Dugger agreed that the Defendant's actions were the reason he could not be with his family.

Susan Dugger-McCarrge testified that she was Ms. Dugger's aunt and that she had known the Defendant for over eight years. She said the Defendant was a "phenomenal" person and that he made a very bad mistake. She had never seen the Defendant act violently. She said she could help the Defendant find employment when he was released.

The Defendant testified that what he did to the victims was wrong. He said that he did not intend for anyone to get shot and that he should have handled the situation differently. He apologized to the victims. He said he would never use drugs again.

-15-

On cross-examination, the Defendant agreed that he gave Mr. Ramirez the gun used to shoot the victims. He said he did not tell Officer Morton that the victims "got what they deserved" or that he did not care if Mr. Hardin was paralyzed. He said he told Officer Morton that it was not his fault if Mr. Hardin was paralyzed. He agreed he told the police that the victims' being shot was worth more than the money he lost but said he was upset when he spoke with the police and did not mean what he said. He agreed he told the police that if he had brought the gun into the house, everyone would have been dead but said he made the statement out of anger.

The Defendant agreed he had prior felony convictions and said he was convicted for possessing counterfeit money, cashing counterfeit checks, and delivering and manufacturing marijuana. He estimated that he had been arrested eight times. He agreed he was convicted of driving with a suspended license and possession of brass knuckles. He agreed that he bought the brass knuckles that were used in this case after his previous set was confiscated. He denied regularly carrying brass knuckles and said that he only had them for protection and that he bought the brass knuckles and the baton on the day of the attack. He agreed he asked other persons to accompany him to the victims' cabin in addition to Mr. Ramirez and Mr. Davis.

On redirect examination, the Defendant agreed that his statement to the police was emotional and that he told the police he was sorry for what happened. He said he voluntarily spoke with the police because he thought he was doing the right thing. He said he was a different person than he was at the time of these crimes.

The trial court found that the following enhancement factors applied pursuant to Tennessee Code Annotated section 40-35-114 (2010): (1) the Defendant had a previous history of criminal convictions; (2) the Defendant was the leader in the commission of an offense that involved two or more criminal actors; (6) the personal injuries inflicted upon the victims were particularly great; and (9) the Defendant possessed a deadly weapon during the commission of the offense. The trial court applied each factor to the attempted first degree murder convictions, factors (1) and (2) to the aggravated assault conviction and the attempted aggravated robbery conviction, and factors (1), (2), and (9) for the especially aggravated burglary conviction. The court found that mitigating factor (13) applied because the Defendant was remorseful and apologetic. See T.C.A. § 40-35-113 (2010). The court applied factor (13) to each conviction but found that the enhancement factors greatly outweighed the mitigation factor for each conviction.

In determining that consecutive sentences were appropriate, the trial court found that the Defendant had an extensive record of criminal activity and that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no

hesitation about committing a crime in which the risk to human life is high. See T.C.A. §§ 40-35-115(b)(2), -115(b)(4) (2010).

With regard to enhancement factors, the Defendant argues that the record did not support factor (1) and that factor (6) was inapplicable to the attempted first degree murder convictions because the risk of great injury is inherent in that offense. He concedes that enhancement factors (2) and (9) were appropriate.

The trial court found that factor (1) was applicable because the Defendant had numerous misdemeanor convictions and a felony conviction. The record reflects that after the Defendant's eighteenth birthday, he obtained a felony conviction for possessing counterfeit "bank-municipal bills," eight misdemeanor convictions for traffic offenses, and one misdemeanor conviction for possessing a prohibited weapon. We hold that the trial court did not err by finding factor (1) applicable to the Defendant's convictions.

With regard to factor (6), the trial court noted that the personal injuries inflicted upon the victims were particularly great because Mr. Hardin was paralyzed and Mr. Lyons suffered daily pain in his leg. The Defendant argues that this factor is inapplicable to any offense where serious bodily injury is inherent in the offense. Although the risk of serious injury may be inherent in an attempted first degree murder, an actual injury is not an element of that offense. Enhancement factor (6) is predicated on the victim's suffering great injury. Here, Mr. Hardin and Christopher Lyons each suffered from gunshot wounds that can affect their mobility for the rest of their lives. We hold that the trial court did not err by finding factor (6) applicable to the Defendant's attempted first degree murder convictions.

With regard to consecutive sentences, the Defendant argues that the record did not support a finding that he had an extensive criminal record and that the trial court failed to make the required findings to support its determination that he was a dangerous offender. When determining if sentences should run consecutively, "trial courts are not limited to considering the defendant's criminal activity or conduct that occurred after the defendant's eighteenth birthday." State v. Banks, 271 S.W.3d 90, 147 (Tenn. 2008). The record reflects that in addition to his one felony conviction and nine misdemeanor convictions that were obtained after the Defendant's eighteenth birthday, he also was convicted of felony delivering and manufacturing marijuana and felony uttering and publishing when he was seventeen. We hold that the trial court did not err in finding that the Defendant had an extensive record of criminal activity. See State v. Koffman, 207 S.W.3d 309, 324 (Tenn. Crim. App. 2006) (holding that the trial court did not err by finding that a defendant with three prior felony convictions, four prior misdemeanor convictions, and a history of illegal drug use had a record of extensive criminal activity); State v. Michael D. Wright, No. M2001-00793-CCA-R3-CD, Williamson County (Tenn. Crim. App. Feb. 14, 2002) (holding

that the trial court did not err by finding that a defendant with two prior felony convictions and seven prior misdemeanor convictions had a record of extensive criminal activity), perm. app. denied (Tenn. June 24, 2002). This factor alone supports the trial court's imposition of consecutive sentencing. See Mickens, 123 S.W.3d at 394.

With regard to the trial court's finding that the Defendant was a dangerous offender, the trial court stated that the offenses were "terrible" and that

> Mr. Dickson and the accomplices came to this home armed with firearms, brass knuckles, a pellet pistol . . . [and] the baton. After the initial confrontation of shots being fired Mr. Dickson continued to assault Mr. Anthony Lyons with the club. The use of these weapons, the conduct clearly shows dangerous behavior and would justify the running sentences consecutive in this case . . . . the aggregate sentence would reflect the seriousness of these offenses and protect the community . . . ."

Although the trial court noted when considering the Defendant's criminal history that the Defendant's previous conviction for carrying brass knuckles indicated he had a "propensity toward use of deadly weapons or dangerous weapons," the trial court did not find that an extended sentence was necessary to protect the public against further criminal conduct by the Defendant. However, the Defendant's record of criminal activity supported the trial court's imposition of consecutive sentencing. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgments for the attempted first degree murder of Christopher Lyons, aggravated assault, and attempted aggravated robbery. We reverse the judgments for the attempted first degree murder of Rodney Hardin and especially aggravated burglary and remand the case for sentencing and entry of judgments of conviction for attempted second degree murder and aggravated burglary.

_____

JOSEPH M. TIPTON, PRESIDING JUDGE