IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2017

**STATE OF TENNESSEE v. BILLY JOE NELSON**

**Appeal from the Circuit Court for Coffee County**
**No. 40156     Paul G. Summers, Senior Judge**

_____

**No. M2016-00010-CCA-R3-CD**

_____

Following a trial, a Coffee County jury found the Defendant, Billy Joe Nelson, guilty of aggravated rape, carjacking, robbery, and two counts of aggravated kidnapping. The trial court sentenced the Defendant to a total effective sentence of thirty years in the Department of Correction. On appeal, the Defendant challenges whether the State sufficiently proved his identity as the perpetrator of the offenses. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jeremy W. Parham, Nashville, Tennessee, for the appellant, Billy Joe Nelson.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Craig Northcott, District Attorney General; Kristy K. West and Jason Michael Ponder, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

On December 31, 2012, the victim[1] celebrated New Year's Eve at the 41 South Sports Bar and Grill ("41 South") in Manchester where her husband and his band were

_____

[1] We will not use the name of the victim in this opinion as it is the policy of this court not to reveal the identity of victims of sexual assault.

performing for patrons of the bar. After their show ended, sometime between 12:30 a.m. and 1:00 a.m. on January 1, the victim's husband needed to help the band take down equipment and load it onto a trailer. The victim was tired and wanted to go to sleep, so her husband escorted her to their car, which was parked in a well-lit parking lot beside the bar, so that she could sleep in the car while he loaded the equipment. Because it was cold outside, the victim started the car and turned on the heat. She reclined in the passenger seat, pulled a coat up over her lap, and fell asleep. Sometime later, the victim awoke to find that the car was "in motion," and a man was talking. When she turned over, the victim discovered that the Defendant was driving her car down Highway 55 towards Tullahoma. The victim did not know the Defendant and had never seen him before. The Defendant asked her, "Where did you think you were going, b****, you've been flirting with me all night, did you think you would get away from me[?]" The Defendant then said, "[C]ome here, b****, and suck my d***[.]" The Defendant, whose blue jeans were opened, grabbed the back of the victim's head and forced her mouth onto his penis. As he continued to drive, the Defendant forced the victim to perform oral sex.

The Defendant pulled into a dark parking lot near Manchester High School. When the car stopped, the victim opened her car door and attempted to get out, but the Defendant grabbed her by the hair and pulled her towards him, saying, "[W]here are you going, b****, I'm not through with you, you're a rich b****, I'm going to rape you up the a**, do you understand that[?]" He pulled out clumps of the victim's hair and bit her face under her left eye, causing her to let go of the car door. The Defendant also told the victim that he had a gun as he pulled her back into the car. He then made the victim pull down her pants, and he penetrated her vagina with his finger as he drove back onto Highway 55.

The victim later explained that she had "never felt pain like that before" and that she eventually "just gave in." The Defendant told her to pull up her sweater, and she did. He then pulled up her bra and "pinched [her] nipple." The Defendant asked her several times if she wanted to see his gun, but she "kept saying no[.]" The Defendant referred to the victim several times as "rich b****," so the victim asked the Defendant if he wanted money. The victim grabbed her purse from the backseat and told the Defendant that she could give him money. She retrieved her wallet, took out credit cards and gift cards, and attempted to give them to the Defendant. At the same time, the victim realized that she had her cell phone in the purse, and she called 911. When the dispatcher answered the call, however, it could be heard over the car's speakers because the cell phone was connected to the car through Bluetooth technology. The call to 911 was disconnected, but moments later, the victim's husband called her cell phone. The Defendant was angry that the victim was using her cell phone, and the victim's husband heard the victim saying, "[P]lease, don't shoot me." The victim's husband then hung up and called 911.

The victim begged the Defendant to take her to her credit union, which was in a well-traveled part of town.  Instead, the Defendant drove to the ATM at Citizens Tri-County Bank, where he demanded the victim's ATM card.  When she could not find the card in her wallet, she again requested that they go to the credit union.  The Defendant backed out of the parking lot and drove towards the credit union.  However, the Defendant made a U-turn and "started flying" down the road.  Eventually, the Defendant stopped the car and opened the driver's side door.  The lights came on inside the car, and the victim saw that her credit cards and business cards were "everywhere" in the car.  The Defendant leaned over and picked up cards off the floorboard.  He then demanded the victim's jewelry, and she gave him her wedding ring and an heirloom diamond ring.  The Defendant told her, "I know where you live, b****, . . . don't move your head for ten minutes[,] or I will f***ing blow it off."

When the Defendant got out of the car, the victim locked the doors and "just sat there."  The victim's husband called again and asked the victim where she was, but she was "hysterical" and said she had "no idea[.]"  Her husband convinced her to get in the driver's seat and leave the area.  The victim noticed a dumpster in front of her car that said "Dossett use only."  She then told her husband that she was at Dossett Apartments in Tullahoma.  The victim called 911 a second time as she was driving to the police station.  She told the 911 dispatcher that she felt "out of control and shaky" and like she "should not be driving."  Officers intercepted the victim's car, and she was taken by ambulance to Harton Regional Medical Center.  The victim was "very upset . . . [and] terrified."  At the hospital, the victim was treated for her injuries, including an abrasion on her scalp and the bite mark on her face.  An emergency room physician also performed a rape kit, which was then turned over to investigators with the Manchester Police Department.

The victim provided the investigators a description of the Defendant and stated that he was wearing a black hoodie and blue jeans.  She stated that the lights were on inside the car and that she saw the Defendant's face when she handed him the rings and as he instructed her to not to move for ten minutes.  In describing the sexual assault, the victim stated that, when she was forced to perform oral sex, the Defendant's black hoodie rubbed against her cheek.  She said that she was unsure if the Defendant ejaculated during the assault.

The victim's car was processed at the Manchester Police Department's impound lot.  Investigators swabbed multiple surfaces in the car for "touch DNA" and dusted for latent fingerprints inside the car.  Investigators also went to 41 South, where they reviewed video surveillance footage from the New Year's Eve party during the timeframe that the victim had been at the bar.  On the video surveillance footage, investigators saw two men wearing black hoodies. Manchester Police Department Investigator Billy Butler recognized one of the men as someone he knew.  Investigator Butler later spoke to

Shirley Cooley, who had been at 41 South for the New Year's Eve party, and she was able to identify the second man in a black hoodie on the video surveillance footage. On the morning after the victim's kidnapping, Ms. Cooley learned about the crime when she received a phone call from a friend. During the conversation, Ms. Cooley learned that the assailant had worn "a black hoodie sweatshirt." Ms. Cooley recalled that, while at 41 South the night before, a man wearing a black hoodie "kept coming up to [her] table," saying that he wanted to go to Mickey's Bar and Grill. The man asked Ms. Cooley if she wanted to go with him, but she refused. He told Ms. Cooley that his name was Billy Nelson and that he was from Indiana. Ms. Cooley contacted investigators, and when shown the video surveillance footage from 41 South, she was able to identify the Defendant as the second man in the black hoodie. Investigators then showed the victim the video surveillance footage, and the victim immediately identified the second man in the black hoodie as the man that had assaulted her.

Later that day, the Defendant called Investigator Butler and asked if investigators were looking for him. The Defendant wanted to talk over the phone, but Investigator Butler insisted that the Defendant come to the police department. The Defendant claimed that he had been in Alabama since December 28, 2012, working at a construction job. Although the Defendant agreed to meet Investigator Butler at the police department the following day, the Defendant did not show up. Investigator Butler later located the Defendant at a residence in Cannon County. Investigator Butler transported the Defendant back to Manchester, where he interviewed the Defendant after the Defendant waived his *Miranda* rights. The Defendant told Investigator Butler:

> I was at a party . . . from 6:00 p.m. to 2:00 a.m. Jeremy and Adrian Robertson was [sic] having a party. I left at Jeremy's at about 2:00 a.m. I went to 41 then went to Mickey's. I was wearing a pair of blue jeans and a Carhartt jacket, light brown, black and gray Nikes.

> We went in the front door at the 41 South Sports Bar. We then went straight to Mickey's, and I spoke to Mickey and talked about the DJ [sic] could I sing a karaoke song. . . . Mickey said shut it down. . . . I left here yesterday morning and went to Tuscaloosa, Alabama, turned around and came back at 4:00 a.m.

Investigators subsequently obtained a search warrant to search the Cannon County residence, where the Defendant lived with his girlfriend and her mother. During the execution of the search warrant, investigators found a black hoodie in the laundry room and collected it as evidence.

- 4 -

Investigators also visited the Defendant's friend, Derek Carver, at his home on East Grundy Street in Tullahoma. Mr. Carver's home was within walking distance of Dossett Apartments. Mr. Carver told investigators that sometime in the early morning of January 1, 2013, the Defendant entered his residence carrying a car amplifier. Mr. Carver stated that it was unusual for the Defendant to show up unannounced that early in the morning. The Defendant told Mr. Carver that "he got robbed" and needed to use Mr. Carver's phone to call his girlfriend for a ride home. The Defendant left "a stack of cards" at Mr. Carver's residence, which Mr. Carver later threw into a trashcan. When Mr. Carter retrieved the cards for investigators, they found that the cards belonged to the victim and included her driver's license, credit cards, and personalized business cards.

The Manchester Police Department submitted all items of evidence collected to the Tennessee Bureau of Investigation crime lab, including buccal swabs from the Defendant and the victim. Special Agent Chad Johnson, a forensic scientist with the crime lab, tested a stain on the front pocket near the waistline of the Defendant's black hoodie. He swabbed the area of the stain, and subsequent testing revealed that there was a mixture on the hoodie of spermatozoa and alpha-amylase, which was indicative of saliva. DNA testing showed that there was a mixture of DNA on the hoodie; the "sperm component" matched the Defendant's DNA profile, and the "non-sperm component" matched the victim's DNA profile.

Following the investigation, the Coffee County Grand Jury indicted the Defendant for aggravated rape, carjacking, robbery, and two counts of aggravated kidnapping.[2] Following a trial, the Defendant was convicted as charged. The trial court merged the convictions for aggravated kidnapping into a single conviction and sentenced the Defendant, as a Range I standard offender, to twenty years with a 100% release eligibility for aggravated rape; ten years with a thirty percent release eligibility for carjacking; six years with a thirty percent release eligibility for robbery; and ten years with a 100% release eligibility for aggravated kidnapping. The trial court ordered all sentences to run concurrently with each other, except for the twenty-year sentence for aggravated rape, which the trial court ordered to run consecutively to the sentence for aggravated kidnapping, for a total effective sentence of thirty years at 100% in the Department of Correction.

The Defendant filed a timely motion for new trial, which was denied by the trial court after a hearing. This timely appeal follows.

---

[2] The dual counts of aggravated kidnapping were based on two different theories of the commission of the offense: (1) that the victim suffered bodily injury; and (2) that the Defendant was in possession of a deadly weapon or threatened the use of a deadly weapon. *See* Tenn. Code Ann. § 39-13-304(a)(4)-(5) (2010).

## Analysis

On appeal, the Defendant contends that the evidence presented at trial was insufficient to support his convictions because the State did not prove beyond a reasonable doubt his identity as the perpetrator of the offenses. The State responds that the jury heard sufficient evidence to prove that the Defendant was the perpetrator and that his convictions should be affirmed. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact-finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." *Id.* (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Koffman*, 207 S.W.3d 309, 322 (Tenn. Crim. App. 2006) (citing *State v. Radley*, 29 S.W.3d 532, 536 (Tenn. Crim. App. 1999)). "The reliability of an in-court identification depends on the totality of the circumstances, 'including the opportunity of the witness to view the offender at the time of the crime, the witness's degree of attention, the accuracy of the prior description of the offender, the level of certainty of the

witness at the confrontation, and the length of time between the crime, and the confrontation.'" *Id.* (quoting *State v. Beal*, 614 S.W.2d 77, 82 (Tenn. Crim. App. 1981)).

In this case, the victim identified the Defendant at trial as the man who kidnapped, raped, and robbed her. She testified that she was in the car beside the Defendant for an extended period of time before he left her in her car at Dossett Apartments. She stated that she could see the Defendant's face in profile as he drove and that, when the Defendant was getting out of the car, the interior lights of the car came on, and she could see his whole face as he stole her rings and ordered her not to move for ten minutes. The victim testified that she had "no doubt" about the Defendant's identification. Following the attack, the victim provided investigators with a physical description of the assailant and recalled that the Defendant wore a black hoodie. When she watched the video surveillance footage from 41 South, the victim immediately recognized the Defendant and his black hooded sweatshirt on the video. Because the victim viewed the Defendant under such circumstances that would permit a positive identification to be made, her testimony alone would be sufficient, if credited by the jury, to support the Defendant's convictions.

The State, however, presented additional evidence confirming the victim's identification. Ms. Cooley testified at trial that she met the Defendant at 41 South on the night of the attack. She recalled that the Defendant was wearing a black hoodie and that he wanted her to accompany him to another bar. The Defendant introduced himself by name to Ms. Cooley, as Billy Nelson, and she later recognized the Defendant as the second man in the black hoodie seen on the video surveillance footage. Additionally, Mr. Carver testified that, in the early morning of January 1, the Defendant unexpectedly entered his residence, which was within walking distance of Dossett Apartments. The Defendant left the victim's credit cards, driver's license, and business cards, which he had just stolen from the victim, at Mr. Carver's residence. Clearly, Ms. Cooley's and Mr. Carter's testimony provided further proof of the accuracy of the victim's identification of the Defendant.

Additionally, forensic evidence supports the victim's identification of the Defendant. Agent Johnson testified that he found a DNA mixture consisting of the Defendant's sperm and alpha-amylase (indicative of saliva) belonging to the victim on the black hoodie found in the laundry room of the Defendant's residence. Finding evidence of the victim's saliva on the front of the hoodie would be consistent with the victim's testimony that the Defendant forced her to perform oral sex while he drove her car. Based on this evidence, a rational juror could conclude that the State had proven the Defendant's identity as the perpetrator beyond a reasonable doubt.

In his brief, the Defendant argues that victim's identification "is suspect" because she had been drinking and was tired. Although the victim testified that she had five drinks over about six hours on the night of December 31, 2012, she stated that she never felt any effects from the alcohol. The victim's husband also testified that he did not see any signs that the victim was intoxicated. Based on the verdict, the jury accredited the testimony of the victim and the victim's husband in this regard. As previously noted, questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact-finder. *Bland*, 958 S.W.2d at 659. The Defendant also argues that Mr. Carver's testimony was somehow influenced by the manner in which investigators questioned Mr. Carver about the Defendant. He contends that officers surrounded Mr. Carver's home during his interaction with investigators. However, the Defendant's argument amounts to mere speculation as to Mr. Carter's motive for speaking with investigators and turning over the cards left by the Defendant. As noted by the State, such an argument goes to the weight of the evidence, which is determined by the jury and not this court. *Id.* Finally, the Defendant argues that, despite the fact that the victim and the Defendant did not know one another, the DNA evidence was insufficient to support his convictions because Agent Johnson could not testify that the Defendant's semen and the victim's saliva were deposited on the same location of the black hoodie and at the same time. However, it was for the jury to decide the weight to be given to circumstantial evidence, as well as the inferences to be drawn from such evidence. *Rice*, 184 S.W.3d at 662.

## Conclusion

When viewed in the light most favorable to the State, the evidence is sufficient to support the jury's finding that the Defendant committed the offenses of aggravated rape, carjacking, robbery, and aggravated kidnapping against the victim. Accordingly, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE